KATHERINE JEAN GRAHAM, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5837–76, 9384–79, 374–80.     Filed October 15, 1984.

*Robert N. Harris, Christopher Cobb,* and *John E. Taussig,* for the petitioners.

*James M. Kamman* and *Charles Rumph,* for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency | Date of deficiency notice |
|---|---|---|---|---|
| 5837–76 | Katherine Jean Graham[2] | 1972 | $316.24 | Apr. 7, 1976 |

---

[1]Cases of the following petitioners are consolidated herewith: Richard M. Hermann, docket No. 9384–79; David Forbes Maynard, docket No. 374–80.

[2]Petitioner Graham was unmarried during the tax year in question. Subsequently, she married, and her married name is Mrs. Elliott.

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency | Date of deficiency notice |
|---|---|---|---|---|
| 9384–79 | Richard M. Hermann | 1975 | $803.00 | Apr. 4, 1979 |
| 374–80 | David Forbes Maynard | 1977 | 643.00 | Nov. 14, 1979 |

The issues before the Court are: (1) Whether payments made by petitioners to the various churches of Scientology[3] were deductible charitable contributions, and (2) whether denial of the claimed deductions would violate petitioners' constitutional rights.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. The parties specifically stipulated to the entire record in *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984). All relevant findings of fact and court rulings from that case will be incorporated into this opinion. Since neither party argued to the contrary, it will be assumed that the Church of Scientology continued to operate at all relevant times in the same manner as it did in *Church of Scientology of California v. Commissioner, supra.*

For purposes of this litigation only, respondent did not contest petitioners' contentions that: (1) Scientology was at all relevant times a religion; (2) each Scientology organization to which petitioners paid money was at all relevant times a church within the meaning of section 170(b)(1)(A)(i),[4] and (3) Scientology was at all relevant times a corporation described in section 170(c)(2) and exempt from general taxation under section 501(a) as an organization described in section 501(c)(3).

Petitioners' residences at the time they filed their respective petitions in this case, and the places they filed their timely income tax returns for their respective years are as follows:

---

[3]For convenience, these various churches of Scientology will be referred to as either the Church of Scientology or the Church.

[4]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

| Petitioner | Residence | TYE Dec. 31— | Appropriate office of IRS |
|------------|-----------|--------------|---------------------------|
| Graham | Honolulu, HA | 1972 | Honolulu, HA |
| Hermann | Los Angeles, CA | 1975 | Fresno, CA |
| Maynard | Rialto, CA | 1977 | Fresno, CA |

Petitioners were at all relevant times Scientologists. Scientology[5] teaches that the individual is a spiritual being having a mind and a body. Part of the mind, called the "reactive mind" is unconscious. It is filled with mental images that are frequently the source of irrational behavior. Through the administration of a Scientology process known as "auditing," an individual, called a "preclear," is helped to erase his reactive mind and gain spiritual competence. Auditing is also referred to as "processing," "counseling," and "pastoral counseling."

Scientologists believe that they can attain benefits from auditing and training, but only in degrees or steps. These include levels called "Grades" and higher levels called "OT sections." The various steps or degrees of accomplishment are set forth in a chart entitled "Classification Gradation and Awareness Chart of Levels and Certificates."

A trained Scientologist, known as an "auditor," administers the auditing. He is aided by an electronic device called an "E-meter." This device helps the auditor identify the preclear's areas of spiritual difficulty by measuring skin responses during a question and answer session. These auditing sessions are offered in fixed blocks of time called "Intensives."

One of the tenets of Scientology is that, anytime a person receives something, he must pay something back. This is called the doctrine of exchange. The Church of Scientology applies this doctrine by charging a "fixed donation" for training and auditing. With few exceptions, these services are never given for free.[6] Thus, fixed donations are generally a prerequisite to

---

[5] For an indepth review of the Scientology religion and its structure, see *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984).

[6] The Church of Scientology has a nine-volume encyclopedia of Scientology policy called the OEC series. Hubbard Communications Office Policy Letter (HCO PL) Sept. 27, 1970 (Issue I), 3 OEC 89, describes the Church of Scientology's policy against free services and price cutting. It states:

Price cuts are forbidden under any guise.

1. PROCESSING MAY NEVER BE GIVEN AWAY BY AN ORG. Processing is too expensive to deliver.

* * * * * * *

a person's receiving auditing and training. These fixed dona-
tion payments constitute the majority of the Church of
Scientology's funds, and are used to pay the costs of church
operations and activities.

The general rates of the fixed donations for auditing in 1972
were as follows:

| | |
|---|---|
| 12½–Hour intensive | $625 |
| 25–Hour intensive | 1,250 |
| 50–Hour intensive | 2,350 |
| 75–Hour intensive | 3,350 |
| 100–Hour intensive | [7]4,250 |

In addition, the Church of Scientology offered two specialized
types of auditing for a higher fixed donation—

| | |
|---|---|
| Integrity Processing | $750 per 12½–Hour intensive |
| Expanded Dianetics | $950 per 12½–Hour intensive |

Members of the Church of Scientology are encouraged to
make advance payments for Scientology courses. If payment is
made well in advance of the services to be rendered, a discount
of 5 percent can be obtained by the member. When a
parishioner makes an advance payment, the Church credits
his account. Once the individual begins receiving a service, his
account is debited. It is the Church of Scientology's policy to
refund advance payments upon request at any time before
services are received.[8]

The Church of Scientology operates in a commercial manner
in providing these religious services. In fact, one of its
articulated goals is to make money. This is expressed in HCO
PL March 9, 1972, MS OEC 381, 384. It sets out the governing
policy of the Church of Scientology's financial offices by
exhorting these offices to "MAKE MONEY. * * * MAKE
MONEY. * * * MAKE MORE MONEY. * * * MAKE OTHER
PEOPLE PRODUCE SO AS TO MAKE MONEY." The goal of
making money permeates virtually all of the Church of

---

9. ONLY FULLY CONTRACTED STAFF IS AWARDED FREE SERVICE, AND THIS IS DONE
BY INVOICE AND LEGAL NOTE *WHICH BECOMES DUE AND PAYABLE IF THE CON-
TRACT IS BROKEN.* [Emphasis added.]

[7]Historically, the price of a 25-hour intensive was fixed at an amount equal to 3 months of pay
for the average middle-class worker in the district of the Scientology Church providing the service.

[8]No evidence was produced with respect to the actual amounts, if any, of such refunds during the
tax years in issue.

Scientology's activities—its services, its pricing policies, its dissemination practices, and its management decisions.

The Church of Scientology promotes its services through free lectures, congresses, free personality tests, and handouts. Advertisements are placed in newspapers, magazines, and on the radio. These promotional activities are geared to be responsive to community concerns, which are determined from surveys.

In 1972, Graham made payments totaling $1,682 to the Church of Scientology, Hawaii, and to the Scientology and Dianetic Center of Hawaii. Of this amount, approximately $400 went towards training, the balance went for auditing. These payments were for the Hubbard Qualified Scientologist course (HQS), Communications course, and auditing. Some of the payments toward courses were for Graham's daughters, Karen and Laurel. When Graham made those payments, she expected to receive, and did receive, the benefit of those services. On her 1972 income tax return, Graham deducted $1,682 as a charitable contribution.

In 1975, Hermann paid the Church of Scientology, American Saint Hill Organization (ASHO) $4,875. At the time Hermann made these transfers, he expected to receive Class 0 to 9 training. While Hermann did not take these courses, he did take other Scientology courses and has received auditing between 1974 and the present. On his 1975 income tax return, Hermann deducted $3,922 as a charitable contribution.

In 1977, Maynard paid the Church of Scientology, Mission of Riverside, $4,698.91 as advance payments for services. While Maynard did not receive any services in 1977, he made those remittances with the expectation of taking Interiorization Processing, Expanded Dianetics, and auditing. On his 1977 income tax return, Maynard claimed a $5,000[9] charitable contribution deduction.

In the respective notices of deficiency, respondent disallowed these claimed charitable contribution deductions. Respondent maintains that it was not established that the payments to the Church of Scientology were contributions or gifts rather than payments for services or merchandise.

---

[9]This amount consisted of a $2,385 carryover from 1976 transfers and $2,615 for transfers in 1977.

OPINION

## Issue 1. Deductibility of Payments Made

The taxpayer has the burden of proving that a particular payment is a "contribution or gift." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners argue that their remittances to the Church of Scientology met the statutory requirements of section 170, subsections (a) and (c), and thus were deductible charitable contributions. Respondent maintains that those payments were not "contribution[s] or gift[s]" within the meaning of section 170(c). Rather, he insists they were made to purchase services, i.e., a quid pro quo, and thus were nondeductible personal expenditures.

Section 170(a)(1) allows as a deduction any charitable contribution payment which is made within the taxable year. Section 170(c) defines the term "charitable contribution" as "a contribution or gift." Neither section 170 nor the regulations further elaborate on the meaning of "charitable contribution." This issue was addressed, however, in *DeJong v. Commissioner*, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962). There, the Court stated—

As used in this section the term "charitable contribution" is synonymous with the word "gift." * * * A gift is generally defined as a *voluntary transfer* of property by the owner to another *without consideration* therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift. * * * [*DeJong v. Commissioner, supra* at 899. Citations omitted; emphasis added.]

Petitioners wanted to receive the benefit of various religious services provided by the Church of Scientology. The Church of Scientology, however, generally provided those services only if they were purchased. To encourage such purchases, the Church of Scientology gave a 5-percent discount to parishioners who made advance payments. A person who made an advance payment but chose not to receive the services could request a refund of his money. Petitioners thus made payments to the Church in exchange for those services.

The record demonstrates clearly that these payments were not voluntary transfers without consideration, but were made with the expectation of receiving a commensurate benefit in return. In addition, where contributions are made with the expectation of receiving a benefit, and such benefit is received, the transfer is not a charitable contribution, but rather a quid pro quo. *Haak v. United States*, 451 F. Supp. 1087, 1090–1091 (W.D. Mich. 1978).

Petitioners Graham and Hermann made payments for which they received religious services. They received a perceived benefit from their transfers. Petitioner Maynard made advance payments to the Church of Scientology. While he did not receive any religious services in 1977, his account was credited for his remittances. This credit entitled him to receipt of services in the future. It was that entitlement which constituted his receipt of a perceived benefit, or the quid pro quo.

Accordingly, none of the payments petitioners made were charitable contributions within the meaning of section 170(c). Instead, they were nondeductible personal expenditures.

### *Issue 2. Constitutional Arguments*

Petitioners maintain that denial of the deduction interferes with their constitutional right to the free exercise of their religion. It is well established that there is no constitutional right to a tax deduction. Benefits granted to taxpayers, such as deductions for charitable contributions, are matters of legislative grace. *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593 (1943); *New Colonial Ice Co. v. Helvering, supra* at 440; *Winters v. Commissioner*, 468 F.2d 778, 781 (2d Cir. 1972), affg. a Memorandum Opinion of this Court. Further, denial of this deduction does not violate the free exercise clause of the First Amendment. *Parker v. Commissioner*, 365 F.2d 792, 795 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967); *Winters v. Commissioner, supra* at 781. The constitutionality of the denial of this deduction was well stated by the Supreme Court in *Cammarano v. United States*, 358 U.S. 498, 513 (1959)—

Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, as everyone else engaging

in similar activities is required to do under the provisions of the Internal Revenue Code. * * *

Respondent is not precluding petitioners from engaging in constitutionally protected activities. Petitioners may practice their beliefs; they just will not be subsidized for them.

Even if denial of the deduction interfered with petitioners' practice of their religious beliefs, not all burdens on religion are unconstitutional. *United States v. Lee*, 455 U.S. 252, 257 (1982). See also, e.g., *Prince v. Massachusetts*, 321 U.S. 158, 163–166 (1944); *Reynolds v. United States*, 98 U.S. 145, 166–167 (1878). The limitation on religious liberty can be justified by showing that it is essential to accomplish an overriding governmental interest. *United States v. Lee, supra* at 257–258. The Supreme Court has stated that "Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax." *United States v. Lee, supra* at 260.

Petitioners also argue that denial of the deductions violates the establishment clause of the First Amendment.[10] Their argument is twofold. First, disallowance would result in disparate treatment of petitioners, in violation of the neutrality requirement of the First Amendment. Second, disallowance would be the result of excessive Government entanglement with religion, in violation of the First Amendment.

Petitioners place heavy emphasis on *Larson v. Valente*, 456 U.S. 228 (1982). In that case, Minnesota had enacted a statute imposing registration and reporting requirements on religious groups which solicited more than 50 percent of their contributions from nonmembers. The Supreme Court held that the statute violated the establishment clause of the First Amendment. In so doing, they rejected an argument that the statute was facially neutral and found instead that it made "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente, supra* at 247 n. 23. The Court further mentioned that "The fifty percent rule of section 309.515, subd. 1(b), effects the *selective* legislative imposition of

---

[10]Petitioners raised similar establishment clause arguments in *Church of Scientology of California v. Commissioner*, 83 T.C. at 447–454. While that case dealt with the constitutionality of sec. 501(c)(3), its rationale is fully applicable to sec. 170 and we incorporate herein by this reference that portion of the opinion.

burdens and advantages upon particular denominations." *Larson v. Valente, supra* at 253–254.

The instant case is distinguishable from *Larson* because section 170, unlike the charitable solicitation law in *Larson*, does not make classifications among religions. Furthermore, unlike *Larson*, here there is no legislative history revealing overt discrimination. Finally, even if section 170 has the effect of advancing one religion more than another, that fact alone does not make the statute unconstitutional. The establishment clause does not prohibit a statute from having a disparate impact on religious organizations provided the disparate impact results from the application of secular criteria. *Lynch v. Donnelly*, 465 U.S. ____, ____ (1984); *Gillette v. United States*, 401 U.S. 437, 452 (1971); *McGowan v. Maryland*, 366 U.S. 420, 442–444 (1961). Here the tests for determining the deductibility of claimed charitable contributions are based on secular criteria. Further, *Larson* is distinguishable from the case at bar because the section 170 classification bears equally upon all religious organizations. Thus, there is not the political divisiveness here that was prevalent in *Larson*. Accordingly, the argument of unconstitutionality under the establishment clause is rejected.

Finally, petitioners insist that denial of the claimed deductions was due to selective discriminatory action. They claim that their rights under the First Amendment and the equal protection component of the due process clause of the Fifth Amendment were violated. The evidence in this case does not demonstrate that any discriminatory action was taken against petitioners by respondent or any of his agents. Petitioners have failed to prove that violation of their rights occurred under either the First or Fifth Amendments.[11]

*Decisions will be entered for the respondent.*

---

[11]This issue of selective enforcement was also raised and rejected in *Church of Scientology of California v. Commissioner*, 83 T.C. at 453 – 454 .