**Robert L. HERNANDEZ, Petitioner, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

No. 86–1276.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1987.

Decided June 1, 1987.

Eric M. Lieberman, New York City, with whom Nicholas E. Posner and Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., were on brief, for petitioner, appellant.

Lee Boothby, Washington, D.C., was on brief, for Americans United for Separation of Church and State, amicus curiae.

David M. Moore, Dept. of Justice, Washington, D.C., with whom Michael L. Paup and Robert S. Pomerance, Dept. of Justice, and Roger M. Olsen, Asst. Atty. Gen., were on brief, for respondent, appellee.

Before COFFIN and SELYA, Circuit Judges, and GIGNOUX,* Senior District Judge.

COFFIN, Circuit Judge.

This appeal presents the question whether a taxpayer who paid the price set by his church in exchange for specified services provided by the church is entitled to deduct the payment from his taxable income as a charitable contribution.

Robert L. Hernandez is a member of the Church of Scientology. In 1981, he paid $7,338 to the Church in exchange for Scientology services called "auditing"[1] and "training."[2] The services were offered to him at fixed prices set by the Church.[3] Hernandez deducted the $7,338 as a charitable contribution on his 1981 federal income tax return, but the Commissioner of Internal Revenue disallowed the deduction and assessed a $2,245 tax deficiency against him. The Tax Court affirmed the disallowance and deficiency assessment, and this appeal ensued.

Hernandez argues that disallowance of his deduction violates his statutory rights under section 170 of the Internal Revenue Code (Code), 26 U.S.C. § 170(c) (1987), and his constitutional rights under the Establishment and Free Exercise clauses of the First Amendment.[4] He also claims that the Internal Revenue Service (IRS) has selectively prosecuted him because of his religion in violation of the Establishment clause and the Fifth Amendment right to equal protection of the laws. After describing the somewhat unusual procedural status of this case, we shall consider each of appellant's arguments in turn.

## I. Procedural History

The parties in this case agreed to be bound, subject to the right of appeal, by the relevant factual and legal findings of the Tax Court in *Graham v. Commissioner*, 83 T.C. 575 (1984), *appeals pending*, Nos. 84–7794, 84–7798, 84–7799 (9th Cir. argued December 10, 1985), a set of three similar cases pending before the Tax Court at the time of their stipulation. The stipulation excludes "findings of fact and conclusions of law relating to any petitioner's subjective intent." The parties in *Graham* had stipulated to the record and relevant rulings in *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984), *appeal pending*, No. 85–7324 (9th Cir. argued August 8, 1985). The *Graham* court ruled in favor of the Commissioner, and it is on the authority of that decision that the Tax Court entered its judgment of deficiency in this case. Because neither party has objected to this procedure, we adopt the records and opinions in *Church of Scientology of California* and *Graham*

---

* Of the District of Maine, sitting by designation.

1. Scientologists are taught that "auditing," also referred to as "processing," "counselling," and "pastoral counselling," is a procedure through which an individual can obtain higher levels of spiritual ability and awareness. Auditing sessions are structured in accordance with the rituals and doctrines of Scientology and are generally administered in private, one-to-one sessions by specially trained Scientologists called "auditors." Stipulation # 1, nos. 12–23, I Stipulated Record at 17–18.

2. The Church of Scientology offers "training" through educational courses including (1) basic introductory courses on the doctrines and tenets of Scientology; (2) auditor training courses; (3) courses on Church management methods; and (4) general educational courses. This case involves courses in the first two categories. Scientologists are taught that spiritual gains will result from studying Scientology doctrines.

Stipulation # 1, nos. 24–33, I Stipulated Record at 18–21.

3. The Church of Scientology generally requires fixed payments, often referred to as "fixed donations" for its auditing and training services. The Church offers discounts on course prices for package purchases and for advance payment. Individuals may obtain refunds on undelivered portions of auditing or training minus an administrative charge and with the proviso that the individual will not again be audited or trained. "Church of Scientology, Information, Definitions, Rules," at 6, I Stipulated Record at 48; "On Exchange," I Record Appendix at 49.

4. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."

as part of the record before us in this case.[5]

We will not repeat here the detailed description of Scientology and its practices recorded in the Tax Court's opinions in those cases, but will refer to the relevant findings throughout our opinion. One set of findings requires preliminary clarification. Following a fifty-one day trial, the Tax Court in *Church of Scientology of California v. Commissioner* upheld the Commissioner's revocation of the tax exemption of the Church's central branch, finding, *inter alia,* that the Church operated for a substantial commercial purpose, that its net earnings inured to the benefit of its officials, and that the Church violated public policy by conspiring, through burglaries of IRS offices and other unlawful means, to prevent the collection of taxes. In the *Graham* case and in this case, however, the Commissioner did not contest the taxpayers' assertions (1) that Scientology is a religion; and (2) that the Church of Scientology is a church within the meaning of section 170(b)(1)(A)(i) and a tax exempt religious organization under sections 170(c)(2), 501(a), and 501(c)(3) of the Code. Stipulation # 1, nos. 52–53, I Stipulated Record at 25.[6] Although preliminary resolution of these questions might have avoided some of the constitutional questions presented in this case, it might also have involved other serious constitutional issues, and so we accept the parties' stipulations for the purposes of this appeal.

## II. Statutory Claim

Section 170 of the Internal Revenue Code allows a taxpayer to deduct from taxable income, any "contribution or gift to or for the use of ... [a] corporation, trust, or community chest, fund, or foundation ... organized and operated exclusively for religious, charitable, scientific, literary, or edu-

cational purposes, or to foster national or international amateur sports competition ..., or for the prevention of cruelty to children or animals." 26 U.S.C. § 170(c). Since the Commissioner has not challenged the Church's status as a tax-exempt religious organization under the Code, the only statutory question before us is whether payments for auditing and training services are "contribution[s] or gift[s]" within the meaning of the Code. Our analysis of this question is framed by the Supreme Court's recent interpretation of the scope of the charitable contribution deduction:

> The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration. The taxpayer, therefore, must at a minimum demonstrate that he purposely contributed money or property in excess of any benefit he received in return.

*United States v. American Bar Endowment,* — U.S. ——, 106 S.Ct. 2426, 2434, 91 L.Ed.2d 89 (1986). In other words, a payment to a charitable organization is tax deductible "only if and to the extent it exceeds the market value of the benefit received" and "only if the excess payment [was] 'made with the intention of making a gift.'" *Id.* 106 S.Ct at 2434.

 The Tax Court in *Graham* found that because the taxpayers' payments to the Church of Scientology were made with the expectation of receiving a commensurate return benefit, namely, auditing and training services, and because such a benefit was actually received, the payments were not charitable contributions, but rather, *quid pro quos.* Hernandez does not allege that his intentions were any different from those of the *Graham* taxpayers. Nor does he claim that he contributed money in excess of the benefit he received in return. Rather, he argues that, as a mat-

---

5. The Tax Court allowed the Commissioner and various taxpayers to follow this same procedure in several hundred similar cases, and, as a result, appeals based largely on the same record are currently pending before all of the other federal courts of appeals except the Federal Circuit.

6. The Commissioner made these concessions even though the record indicates that the IRS's

original reason for disallowing the deduction was that "the reported contribution was not made to a qualified organization." Supplemental Appendix at 7. The government's brief explains that the Commissioner's concessions "apparently reflected a desire to expedite these proceedings without awaiting the final outcome of *Church of Scientology.*" Appellee's brief at 4 n. 5.

ter of law, the return of a commensurate *religious* benefit, as opposed to an *economic or financial* benefit, cannot result in the denial of a section 170 deduction. Thus, he claims that all payments to churches for religious services—whether gifts or not—should be tax deductible under section 170.

Hernandez's position is contrary to the plain language and legislative history of section 170. Section 170 explicitly provides that payments to churches and other qualified organizations are deductible only if they are "contribution[s] or gift[s]." Though the Senate report indicates that Congress intended the phrase "contribution or gift" to include only "those contributions which are made with no expectation of a financial return commensurate with the amount of the gift," the report uses medical care as an illustration of a "financial" return. S.Rep. No. 1622, 83d Cong.2d Sess. 196, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4621, 4830–31. We find no indication that Congress intended to distinguish the religious benefits sought by Hernandez from the medical, educational, scientific, literary, or other benefits that could likewise provide the *quid* for the *quo* of a nondeductible payment to a charitable organization.

Hernandez claims that while the government may assign economic value to secular benefits, it is impossible for the government to determine the economic value of religious benefits. As a practical matter, we note that the government has recognized the economic value assigned to secular services such as adoption services, symphony performances, and museum admission even though the benefits flowing from those services are, in theory, as difficult to monetarize as religious ones. *See Murphy v. Commissioner,* 54 T.C. 249 (1970) (mandatory fee paid to adoption

agency is not tax deductible); Rev.Rul. 67–246, 1967–2 C.B. 104 (price of ticket to charity concert is deductible only to the extent it exceeds the value of admission); Rev.Rul. 68–432, 1968–2 C.B. 104 (cost of museum membership is nondeductible where taxpayer enjoys free admission to poetry readings and the like). In such cases the courts and the IRS look not to the intrinsic value of the benefits, but instead either to (1) the price set by the service providers, (2) the prices set by providers of similar services, or (3) the costs of providing the service.

We find precedent for the proposition that the government may similarly recognize the economic cost of religiously-oriented services that religious organizations provide to taxpayers. In *Oppewal v. Commissioner,* 468 F.2d 1000 (1st Cir.1972), we held that a payment to a parochial school was nondeductible to the extent that it was offset by the cost of providing a "religiously-oriented" education to the taxpayers' children.[7] *See also Winters v. Commissioner,* 468 F.2d 778 (2d Cir.1972); *De Jong v. Commissioner,* 309 F.2d 373 (9th Cir. 1962). In these cases, the courts did not attempt to evaluate the secular or ecclesiastical value of a religious education; rather, they simply recognized the economic cost to the religious organization of providing the religiously-oriented benefit to the taxpayer.

Hernandez attempts to distinguish the parochial school cases by mischaracterizing the "religiously-oriented" education received as a "secular" education with "some small, unspecified element of religious teaching." Appellant's reply brief at 6–7. While it is of course true that substantial secular as well as religious benefits flow from a religiously-oriented education, the same is true of the training and auditing services provided in this case[8] and of other

---

7. In *Oppewal,* we expressed our dissatisfaction with subjective inquiry into taxpayer motivation in making purported charitable contributions. 468 F.2d at 1002. After *American Bar Endowment,* however, it is clear that even when a taxpayer demonstrates that a payment to a charitable organization exceeded the economic value assigned to the return benefit, we must inquire into whether the taxpayer intended the excess

payment to be a gift. 106 S.Ct. at 2434. The clarification does not affect the result in this case, for Hernandez has failed to prove *either* prong of the *American Bar Endowment* test.

8. Church literature states that, in addition to providing an opportunity for spiritual growth, auditing can lead to freedom from drug use, to relief from physical aches and pains, and to

religious services. *Oppewal, Winters,* and *De Jong* did not, as Hernandez claims, rest on findings that the return benefits were predominantly secular. The courts in those cases did not attempt to identify and separate the religious and secular aspects of the educational benefits. Indeed, as Hernandez acknowledges, any attempt to do so could lead to excessive government entanglement with religious doctrine.

We can hypothesize cases in which a literal application of the *American Bar Endowment* test could create both practical and constitutional difficulties. Imagine, for example, a case in which the government monitored church records in an attempt to place a monetary value on the benefit of all church services, group programs, and pastoral counselling generally available to contributing members. Such a case would present not only the problem of determining value but also the problem of excessive entanglement in the affairs a religious institution. The present case, however, raises neither of these problems because (1) the Church of Scientology itself established and advertised monetary prices ("fixed donations") for the services at issue; and (2) Hernandez has not argued that the prices set by the Church exceed the cost of providing the services he received or that he paid any part of the price with the intention of making a gift to the Church. On the basis of the record before us, including the factual findings of the *Graham* court, we conclude that Hernandez has failed to shoulder the burden assigned him by the Supreme Court.[9] Accordingly, we hold that the Tax Court correctly ruled that Hernandez's payments to the Church of Scientology for auditing and training services were not deductible as "charitable contributions" under section 170 of the Code.

improved memory and communicative abilities. 73 *Gateway* at 6–7, I Stipulated Record at 95–96. Similarly, in addition to providing information about "Scientology and its general background," the Hubbard Qualified Scientologist course purchased by some of the *Graham* taxpayers "teaches one how to correctly study and what are the mechanics of learning any subject." 61 *Gateway* at 8, I Stipulated Record at 74.

### III. The Establishment Clause Claims

Hernandez next argues that section 170, both on its face and as applied to him, violates the First Amendment's Establishment clause. We consider these claims in turn.

#### A. Facial Validity

■ Hernandez argues that section 170, on its face, creates denominational preferences of the type forbidden in *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Larson* held that a statute that makes "explicit and deliberate distinctions between different religious organizations," thereby communicating government endorsement or disapproval of those religions, must be subjected to strict scrutiny. 456 U.S. at 247 n. 23, 102 S.Ct. at 1684 n. 23. The statute in *Larson* imposed registration and reporting requirements on religious groups that solicited more than fifty percent of their contributions from nonmembers. The Court held that the Minnesota statute violated the Establishment Clause because it distinguished, without a compelling justification, between " 'well-established churches' that have 'achieved strong but not total financial support from their members,' ... and 'churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members.' " *Id.*

The critical flaw in Hernandez's attempt to analogize his case to *Larson* is that section 170 draws no distinctions among organizations "operated exclusively for religious, charitable, scientific, literary, or educational purposes." The statute does distinguish among types of payments, singling out contributions and gifts for special tax treatment, but we agree with the Tax

**9.** Though the *Graham* case was decided before the Supreme Court's opinion in *American Bar Endowment,* the Tax Court anticipated and correctly applied the *American Bar Endowment* test. Hernandez has not asked this Court to remand for reconsideration in light of *American Bar Endowment,* and we can see no purpose to be served by such a ruling.

Court that the "contribution or gift" requirement is a secular criterion encouraging gifts to all religious and nonreligious charitable organizations and communicating no governmental preference for any particular charitable organization. We therefore reject Hernandez's claim that section 170, on its face, communicates governmental preference for religious denominations other than his own in violation of the Establishment Clause.

### B. Validity as Applied

Hernandez next argues that even if section 170 is facially neutral, the Tax Court applied the statute by drawing nonneutral denominational lines that discriminated against him and his church. Specifically, Hernandez claims that the Tax Court violated the Establishment Clause by discriminating against churches that conduct individual rather than congregational services and against churches that require fixed payments for services rather than relying on voluntary contributions of varying amounts.

■ We have carefully reviewed the *Graham* court's opinion and find no basis for Hernandez's claim that the ruling was based upon the individual nature of the auditing and training sessions. Under the Tax Court's analysis, as well as under the Supreme Court's analysis in *American Bar Endowment*, if the return benefit is commensurate with the payment or if obtaining the benefit is the reason for making the payment, then whether the benefit is received in an individual or a group setting, the payment is a *quid pro quo* rather than a gift. 106 S.Ct. at 2434. Our own decision in *Oppewal* illustrates the point, for in that case, payments for a religiously-oriented education were held to be nondeductible personal expenses even though the educational benefit was obtained in a group, rather than an individual, setting. 468 F.2d at 1000. The number of students in the school was relevant only to the calculation of the cost per student of running the school. Where, as here, an organization calculates and sets the price to each recipient of the return benefit, any information concerning the number of persons receiving the benefit is completely irrelevant to the statutory inquiry.

■■ In contrast, the *Graham* court did take into account the fixed and mandatory nature of the auditing and training prices in determining that the taxpayers' payments were made with the expectation of receiving a commensurate return benefit. We believe that this evidence was relevant in determining both the economic value assigned to the return benefit and the taxpayers' intentions in making the payments. Indeed, we believe that evidence that a service was obtained only in exchange for a fixed payment creates, at a minimum, a rebuttable presumption that the payment was not a gift. Like the statutory distinction between gifts and other types of payments, the Tax Court's implicit distinction between fixed mandatory payments and other types of payments is neutral and expresses no disfavor for religion or for any particular religious organization.

■ Hernandez's argument boils down to a claim that the Tax Court's neutral interpretation of section 170 has a disparate impact upon him and, derivatively, upon his church. We note preliminarily that since the record is devoid of evidence showing that the Church of Scientology requires its members to pay more money in the nature of fixed mandatory payments than other churches require of their members, Hernandez has failed to substantiate his claim that the Tax Court's interpretation of section 170 has a disparate impact upon Scientologists. More fundamentally, even if the Tax Court's interpretation of section 170 did have a disparate impact on Scientologists or on their church, such an impact would not invalidate a neutral interpretation of a law whose purpose or primary effect is neither approval nor disapproval of any religious denomination. The Supreme Court has repeatedly held that congressional enactments promoting the general welfare of society do not violate the Establishment Clause just because their "reason or effect merely happens to coincide or harmonize with the tenets of some ... religions." *Lynch v. Donnelly,* 465

U.S. 668, 682, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984) (quoting *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961)). The same must be true of judicial interpretations of those statutes in accordance with the secular legislative intent.

The purpose and primary effect of section 170 is to encourage gifts to charitable organizations. *See* S.Rep. No. 1567, 75th Cong., 3d Sess. 14 (1938), *reprinted in* 1939–1 C.B. (Part 2) 779, 789; *Helvering v. Bliss,* 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246 (1934). The Tax Court's interpretation is consistent with this laudable secular goal. Thus, the law as interpreted by the Tax Court in this case is quite unlike laws whose purpose or primary effect is the establishment of religion. *See, e.g., Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (legislative history established that the sole purpose underlying Alabama's moment of silence statute was to convey a message of State endorsement and promotion of prayer in the public schools); *Larson v. Valente,* 456 U.S. at 254, 102 S.Ct. at 1688 (legislative history of Minnesota's fifty percent rule demonstrated that the provision was drafted with the explicit intention of burdening or favoring selected religious denominations). The Tax Court's interpretation of section 170 is no more unconstitutional than section 170's "gift or contribution" requirement or its limitation on the total amount a taxpayer may deduct,[10] though the former would have a disparate impact on a religion that prohibited giftgiving and the latter would have a disparate impact on taxpayers whose religion required them to contribute a greater percentage of their income than the statute would allow them to deduct. Any incidental disparate impact on Hernandez's religious practices or on his church stemming from the Tax Court's neutral application of section 170 is surely less significant than the impact on various religions of Sunday closing laws, *McGowan v. Maryland,* 366 U.S. at 420, 81 S.Ct. at

1101; city creche displays, *Lynch v. Donnelly,* 465 U.S. at 668, 104 S.Ct. at 1355; legislative prayers, *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); and the host of other governmental actions that have survived Establishment Clause challenges before the Supreme Court. *See Lynch v. Donnelly,* 465 U.S. at 681–82, 104 S.Ct. at 1363–64 (discussing cases).

■ Comparing the Tax Court's interpretation of section 170 with Hernandez's proposed interpretation reveals the constitutional strength of the former and the constitutional infirmity of the latter. Hernandez proposes that all payments for religious services, whether gifts or not, be considered tax deductible contributions. In other words, he proposes that payments for religious services be treated more favorably under section 170 than payments for secular services. We cannot imagine a clearer request for government endorsement of religion. *See Wallace v. Jaffree,* 472 U.S. at 70, 105 S.Ct. at 2497 (O'Connor, J., concurring) (The Establishment Clause prohibits the government from "conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred."); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (Connecticut statute providing employees with the absolute right not to work on their chosen sabbath violated the Establishment Clause because it commanded that "Sabbath religious concerns automatically control over all secular interests at the workplace."); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 794, 93 S.Ct. 2955, 2976, 37 L.Ed.2d 948 (1973) (New York law providing tax benefits to parents of children attending nonpublic schools had the primary effect of advancing religion because, among other reasons, the benefits of the law would flow primarily to parents of children attending sectarian nonpublic schools.) In contrast, like the tax exemp-

---

**10.** "In the case of an individual ... [a]ny charitable contribution to ... a church or a convention or association of churches ... shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year." 26 U.S.C. § 170(b)(1)(A)(i).

tion for property devoted to religious, educational, or charitable purposes upheld in *Walz v. Tax Commission,* 397 U.S. 664, 672–73, 90 S.Ct. 1409, 1413–14, 25 L.Ed.2d 697 (1970), section 170 as interpreted by the Tax Court does not discriminate between religion and nonreligion: gifts to all charitable organizations are tax deductible; *quid pro quo* payments for services are not.

■ Hernandez's suggestion that courts should distinguish between secular and religious services under section 170 runs afoul of the Establishment Clause in yet another way, for requiring the government to distinguish the secular from the religious would require it to engage in ongoing evaluation of the genuineness of assertedly religious services, thereby entangling itself in church doctrine. *See Lemon v. Kurtzman,* 403 U.S. 602, 619–20, 91 S.Ct. 2105, 2114–15, 29 L.Ed.2d 745 (1971) (Government evaluation of parochial school records to determine which expenditures were for secular as opposed to religious education "is fraught with the sort of entanglement that the Constitution forbids."); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (First Amendment prohibits civil courts from interpreting church doctrine and determining the importance of those doctrines to the religion). While the Tax Court's interpretation of section 170 could require the government to make administrative contacts with religious institutions to determine the prices the institutions have set on various religious and secular services, such administrative contact, unlike doctrinal entanglement, does not violate the First Amendment. *See Walz,* 397 U.S. at 698 n. 1, 90 S.Ct. at 1426 n. 1 (Harlan, J., concurring) (Government administration of the property tax exemption does not violate the Establishment Clause because although it involves the government in religious institutions, it does not involve "judicial inquiry into dogma and belief."); *see also Lynch v. Donnelly,* 104

S.Ct. at 1364 ("Entanglement is a question of kind and degree.")

For all these reasons we conclude that section 170, both on its face and as interpreted by the Tax Court, complies with the commands of the Establishment Clause.

### IV. The Free Exercise Claim

■ It is clear that while the First Amendment does not require the government to provide a tax deduction for gifts to religious and other charitable institutions, *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983), once the it has created such a tax benefit, the government may not condition receipt of the benefit upon the abandonment of religious beliefs or practices. *Hobbie v. Unemployment Appeals Commission of Florida,* —— U.S. ——, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). As the Supreme Court explained in *Thomas* and recently reaffirmed in *Hobbie,*

> [w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas,* 450 U.S. at 717–18, 101 S.Ct. at 1432, *quoted in Hobbie,* 107 S.Ct. at 1049.

■ Hernandez attempts to fit this case into the framework established in *Sherbert, Thomas,* and *Hobbie* by arguing that the Tax Court conditioned his receipt of a charitable deduction for auditing and training payments upon his abandonment of the practice of a Scientology doctrine known as the "Doctrine of Exchange."[11] This doc-

---

11. Hernandez also argues that the Tax Court conditioned his receipt of a tax deduction upon

abandonment of his church's practice of individual, as opposed to congregational, ministra-

trine, according to Hernandez, "holds that a person who does not make a contribution in exchange for something of value received will suffer spiritual decline." Appellant's brief at 27. Hernandez further asserts that "the 'fixed donations' at issue in this case were established by the Church for its religious services ... [and are] mandated by the Doctrine of Exchange." *Id.* He claims that only if he and his church abandon the Doctrine of Exchange—specifically the doctrine's requirement that the Church charge fixed prices for training and auditing services—can he obtain the economic benefit of a tax deduction for his auditing and training payments.[12]

We have had some difficulty evaluating this claim. Some of our difficulty stems from discrepancies in the record concerning whether the requirement of fixed mandatory payments for training and auditing comes from religious doctrine or instead from more earthly administrative concerns. Though Hernandez asserts in his brief that the Church's requirement of fixed payments for training and auditing services is mandated by the Doctrine of Exchange, evidence in the stipulated record is inconsistent with that claim. In the *Graham* trial, Petitioner Katherine Graham explained the Doctrine of Exchange as follows:

> Well, basically, what it is is that there is flows, there is an inflow and an outflow. And if you just inflow everything and don't outflow anything, it just, it doesn't work, because eventually you will stop inflowing. In order to feel good about things, the things that you inflow, you have got to flow things out, *and it doesn't have to be money for something else, it can be anything, you know.*

And it's basically that is what is called exchange.

> . . . .

> ... I got Scientology auditing and I got the training. I then turned around and became more responsible and became a Girl Scout leader and flowed into the community, my help. It just—the better you become, the more able you become, the more responsible you become, the more you flow out again to things like your job, your whatever.

II Stipulated Record at 297–98 (emphasis added). Graham also testified that the Church provides some services—such as Sunday services where ministers deliver sermons, "naming" or christening ceremonies, and Friday fellowship meetings—for free. II Stipulated Record at 262–63, 275, 296. Thus, while the record indicates that the Doctrine of Exchange requires some "outflow" in exchange for services, it does not indicate that the doctrine requires "outflow" in the form of fixed monetary payments to the Church. Since the evidence in the record does not support the assertion in appellant's brief that the mandatory and fixed nature of the payments for services in this case were required by the Doctrine of Exchange, it is unclear to this court whether Hernandez's Free Exercise claim can legitimately be based on that religious doctrine. Indeed, if the Doctrine of Exchange does require Hernandez to pay an amount set by the Church for religious services, a tax deduction—an indirect subsidy returning part of that payment to him—would appear to compromise rather than to accommodate his practice of that doctrine.

These inconsistencies between the record and the assertions in appellant's brief to this court give us pause. The Supreme

---

tion. Since we have already observed that the individual nature of the training and auditing sessions played no role in the Tax Court's decision to disallow the deduction, *see supra* p. 1219, we reject this claim as groundless.

12. Hernandez has not argued that the Doctrine of Exchange prohibits him from making contributions over and above the fixed prices for training and auditing or from making other nonmandatory, nonfixed payments without receiving commensurate compensation. Thus, it appears that Hernandez is free to give "gifts," as

that term has been interpreted by the Tax Court, to his church as well as to other qualified charitable organizations, and to deduct these gifts from his taxable income under section 170 without abandoning or compromising any of his religious beliefs or practices. Indeed, the record indicates that Hernandez claimed and was allowed a sixty-dollar deduction from his 1981 taxable income for other contributions to qualified organizations. Supplemental Appendix at 6.

Court has held that conduct stemming from religious doctrine concerning the religious education and upbringing of children, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); sabbatarian observance, *Hobbie,* 107 S.Ct. at 1049; religious dress, *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); and opposition to military activity, *Thomas,* 450 U.S. at 707, 101 S.Ct. at 1425; *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), is to be protected against all but compelling government interests. But to contemplate a particular sect's administrative or accounting modus operandi—here, the "fixed donation" system—as religious conduct sufficient to force the government to demonstrate an overriding compelling interest seems to us to trivialize the Free Exercise clause, by expanding its application in a way not remotely contemplated at any time in our history. *See Bowen v. Roy,* — U.S. ——, 106 S.Ct. 2147, 2156 n. 17, 90 L.Ed.2d 735 (1986). Without adequate record support for this allegedly doctrinal claim, it seems "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." *Thomas,* 450 U.S. at 715, 101 S.Ct. at 1431.

However, even if we assume that the fixed payments in this case were mandated by religious doctrine and that Hernandez's receipt of an income tax deduction for those payments would not infringe upon his practice of that doctrine, we doubt that by taking the fixed and mandatory nature of the payments into account in determining that they were not gifts the Tax Court burdened Hernandez's religious beliefs or practices in any constitutionally significant way. The Supreme Court cases Hernandez relies upon indicate that laws distributing government benefits trigger strict scrutiny when their indirect economic effects can be seen as pressuring individuals to violate their religious beliefs or practices. *Hobbie,* 107 S.Ct. at 1049; *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432; *Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794. We doubt that such a burden exists in this case.

It is of course true that if his claimed deduction for nongift payments for religious services were allowed, Hernandez would have more money. He could, as he suggests in his brief, use this money to purchase more auditing and training; he could also use it to purchase secular goods and services. Thus, it is clear that disallowance of the deduction has economic consequences for him. What Hernandez has failed to show is that on the facts of this case, the economic consequences, like those in *Sherbert, Thomas,* and *Hobbie,* put "substantial pressure on [him] to modify his behavior and violate his beliefs." *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432.

The claimant in *Sherbert* was fired from her job for refusing to work on her religious sabbath. The Supreme Court held that the state's subsequent denial of unemployment benefits

> force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship.

*Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794. Similarly, in *Thomas* a state denied unemployment benefits to a man who was fired for refusing to participate in the production of armaments in violation of his religion. The Court observed:

> "Not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of . . . religion, but the pressure upon [the employee] to forego that practice is unmistakable."

*Thomas,* 450 U.S. at 717, 101 S.Ct. at 1432 (quoting *Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794).

In contrast, it is difficult to see how the denial of the tax deduction at issue in this case could be seen as pressuring *Hernandez* to abandon his practice of paying "fixed donations" for training and auditing services in accordance with the Doctrine of Exchange. While Sherbert had the option of abandoning her practice of not working

on Saturdays, and Thomas had the option of abandoning his practice of not producing armaments, Hernandez does not have the option of obtaining auditing and training without paying the fixed mandatory prices: the Church has offered him the services only in exchange for the advertised prices. Given the fact that Hernandez does not have the authority to avoid the fixed donation system that the Church has established for training and auditing services, the law in this case cannot fairly be seen as exerting substantial pressure upon him to do so.

■■■ Hernandez does argue that the government's disallowance of his claimed deduction pressures a *third party*, namely, the Church of Scientology, to abandon its practice of the Doctrine of Exchange with respect to training and auditing. The argument proceeds as follows: The Church's fixed price schedule for training and auditing, which is mandated by the Doctrine of Exchange, creates the presumption that payments for training and auditing are not tax deductible gifts under the Code. Since the Church relies on its members for financial support, the deductibility of the practicing members' donations to the Church is important to the Church's economic well-being. Thus, the Tax Court's interpretation of section 170 places economic pressure upon the Church to abandon the fixed donation system mandated by the Doctrine of Exchange.

The problem with this argument is that it is based upon the Church's Free Exercise rights rather than upon any rights possessed by Hernandez. Hernandez has not argued that his own religious beliefs or practices would be burdened if the Church were to abandon its fixed price schedule for training and auditing. He does not claim that he needs a fixed price schedule to practice the Doctrine of Exchange with

respect to training and auditing. Therefore, so long as the Church continued to provide Hernandez with training and auditing services—and he has not argued that abandonment of the fixed donation system would result in the termination of such services [13]—Hernandez would be free to practice the Doctrine of Exchange by contributing money in return.

The general rule is that "a litigant may only assert his own constitutional rights or immunities." *McGowan v. Maryland,* 366 U.S. at 429, 81 S.Ct. at 1107 (citing *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960)). Hernandez has not argued that the Church cannot adequately assert its own First Amendment rights. *Compare Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (where religious institutions raised their own Free Exercise claims); *with N.A.A.C.P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (where organization was granted standing to raise the rights of its members who could not practically protect their own interests). Nor has he presented any other countervailing interests which would justify an exception to the general standing requirements. Thus, even if there were merit to the argument that section 170 unconstitutionally burdened the Free Exercise rights of the Church of Scientology, Hernandez lacks standing to make the argument.[14]

Hernandez has failed to show that the disallowance of his claimed deduction communicates any disfavor for his religious beliefs or practices. In being allowed a tax deduction for gifts but not for nongift payments for services, Hernandez is receiving the same treatment as all taxpayers who obtain tax deductions for gifts but not for payment of fixed mandatory prices for reli-

---

**13.** Indeed, even if Hernandez had made this argument, any causal link between the disallowance of Hernandez's claimed tax deduction and the possibility that the Church might, at some point in the future, decide to stop providing training and auditing services would be too speculative to invoke the federal judicial power. *Simon v. Eastern Kentucky Welfare Rights Orga-*

*nization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

**14.** Although our view on the merit of this argument is technically dictum, we observe that any indirect economic burden on the Church's fixed donation system would certainly be outweighed by the compelling government interests discussed *infra* at 1225.

gious or secular services. No special treatment of his nongift payment is warranted, for special treatment of religious claims is appropriate only where it is necessary to lift a government burden disfavoring religion. *See Wallace v. Jaffree*, 472 U.S. at 83, 105 S.Ct. at 2504 (O'Connor, J., concurring); *Bowen v. Roy*, 106 S.Ct. at 2163–64 (Stevens, J. concurring). The accommodation ordered by the Supreme Court in *Sherbert, Thomas,* and *Hobbie* —"the provision of unemployment benefits generally available within the State to religious observers who must leave their employment due to an irreconcilable conflict between the demands of work and conscience"—was no more than a requirement of neutrality in the face of religious differences. *Hobbie,* 107 S.Ct. at 1051 & n. 11. Since Hernandez has not demonstrated that section 170 as interpreted by the Tax Court disadvantages him vis-a-vis other taxpayers making payments for religious or secular services, or that it communicates hostility toward the Scientology religion, his payments for religious services must receive the same treatment under the Code as all taxpayer *quid pro quo* payments for secular or religious services.

■ For the above-stated reasons, we conclude that Hernandez has not demonstrated that the Tax Court's interpretation of section 170's "contribution or gift" requirement burdens religiously mandated conduct. But if we are wrong, then we think the dimensions of such conduct have been so enlarged that government's compelling interests both in preserving the integrity of its system of financing itself and in preventing the establishment of religion justify the incidental impingement. For if sects could set up their own definitions of gifts, income, depreciation, exempt activities, etc., thereby requiring the government to provide them with preferential subsidies, both the fairness and the effectiveness of the revenue system would be crippled. *See United States v. Lee,* 455 U.S. 252, 259, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982) (quoting *Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961)) ("[T]here is a point at which accommodation would 'radically restrict the operating latitude of the legislature.'"). And if

the government were lured into granting special tax deductions because of particular religious beliefs but for no other reasons, it would run up against the Establishment clause prohibition of religious endorsement. *Estate of Thornton v. Caldor, Inc.,* 472 U.S. at 703, 105 S.Ct. at 2914. Granting special tax deductions for nongift payments for religious services would also undercut the legislative goal of encouraging gifts to charitable organizations: if taxpayers could obtain the charitable contribution tax benefit by making payments in exchange for services, they would lose some incentive to make payments without consideration for the use of charitable organizations. The goal of encouraging gifts to charitable organizations seems to us at least as important as a state's interest in declaring Sunday a uniform day of rest, an interest which the Supreme Court has held to be compelling enough to justify an indirect economic burden upon those who observe a Saturday sabbath. *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). For these reasons, we conclude that the disallowance of the tax deduction in this case does not violate the Free Exercise clause of the First Amendment.

## V. The Selective Prosecution Claim

■ Finally, Hernandez claims that he is the victim of selective enforcement by the IRS. To establish his claim of religious discrimination under the First and Fifth amendments, he must prove that the IRS's decision to prosecute him under section 170 was motivated by intentional discrimination against him because of his faith. *See Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951). *Cf. Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). We agree with the Tax Court that Hernandez has failed to carry his burden of proving discriminatory intent on the part of the IRS.

Hernandez asserts that the administrative history of the revenue ruling denying section 170 tax deductions for auditing payments contains evidence of "discrimination

at work." The final version of this ruling provided that

the taxpayer is not entitled to a charitable contribution deduction for any part of the fixed donation made to the church for the auditing courses unless the taxpayer establishes that the fixed donations exceeded the monetary value of the benefits and privileges received and that the amount claimed as a charitable contribution is the amount of such excess.

Revenue Ruling 78–189, 1978–1 C.B. 68. As evidence that this determination was the product of discriminatory animus, Hernandez points first to the fact that, although an early internal draft of the ruling contained an acknowledgement that "[t]he question presented is a close one," this sentence was deleted from the final version. We disagree that this drafting process demonstrates religious bias. The fact that the IRS considered the question to be a close one and evaluated the merits of other possible resolutions suggests to us that the IRS attempted to reach a fair and correct result. We find no basis for inferring that the deletion of the quoted sentence from the final draft was anything other than a stylistic choice.

We also reject Hernandez's claim that the IRS's attempts to compare auditing to other types of services—secular and religious—and to reconcile the ruling with its other revenue rulings under section 170 demonstrate anti-Scientology animus. The analogies to counselling and educational services, even if inexact, do not suggest bias. Like the acknowledgment that the question was "close," the internal IRS memorandum stating that an early draft of the revenue ruling was "pretty hard to distinguish" from another revenue ruling provides no basis from which to infer discriminatory bias.

Finally, Hernandez claims that intentional religious discrimination against him is evidenced by the asserted fact that the

Commissioner has neither applied nor even attempted to apply section 170 to disallow deduction of payments for religious services by members of any other religion. His assertion is plainly wrong. In *Feistman v. Commissioner*, 30 T.C.M. (CCH) 590, 592 (1972), for example, the Commissioner obtained a ruling that a payment made in exchange for a Bas Mitzvah was not deductible as a charitable contribution under section 170.[15] Similarly, cases like *Oppewal*, 468 F.2d at 1000, *Winters*, 468 F.2d at 778, and *DeJong*, 309 F.2d at 373, demonstrate that the Commissioner has prosecuted and obtained deficiency judgments against persons claiming deductions for payments made in exchange for religious education regardless of their particular religious faith. Thus, this case is different from cases like *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), and *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), in which neutral laws were enforced against Jehovah's Witnesses, but not against other religious sects, because of "the dislike which the local officials had of these people and their views." *Fowler*, 345 U.S. at 69, 73 S.Ct. at 527.

Equally meritless is Hernandez's claim that he is similarly situated to persons who have been allowed to deduct contributions to religious organizations made in the form of collection plate offerings or bequests for masses. *See Nelson v. Commissioner*, 7 T.C.M. (CCH) 172 (1948), *aff'd per curiam* 177 F.2d 203 (6th Cir.1949) (collection plate offerings); A.R.M. 2, 1 C.B. 150 (1919) (basket contributions); Rev.Rul. 78–366, 1978–2 C.B. 241 (bequests for masses). Unlike the payments Hernandez made in exchange for training and auditing services, offering-plate contributions are not fixed mandatory payments made in exchange for discrete services. Similarly, while the payments Hernandez made were prerequisites to his obtaining training and auditing services,

**15.** *See also* Rev.Rul. 76–232, 1976–1 C.B. 62: Participants in a weekend marriage seminar conducted by a charitable organization are not entitled to a charitable contribution deduction for any part of a donation made to the organization at the conclusion of the seminar unless the participants establish that the amount donated exceeds the monetary value of all benefits and privileges received and that the amount claimed as a charitable contribution is the amount of such excess.

the payment involved in Rev.Rul. 78-366 was held to be a gift precisely because the mass would have been said as a regular part of the church's ceremony whether or not any payment had been made. The facts distinguishing this case—payment of an amount set by the Church as a prerequisite to obtaining specific services—are significant, for they created the presumption, unrebutted by Hernandez, that his payments were not "contribution[s] or gift[s]" within the meaning of the Code.

While we have some doubt as to the continuing validity of the presumption in Rev.Rul. 70-47, 170-1 C.B. 39, that pew rents and mandatory church dues are tax deductible gifts, we cannot say that the IRS distinguished those payments from the ones in issue here on the basis of religious prejudice. The IRS found significance in the fact that unlike the collective worship services obtained in exchange for pew rents and, to a large degree, membership dues, auditing and training services are performed in private sessions. We have recognized that if a person pays a fixed mandatory price in exchange for services, the collective or individualized nature of those services is irrelevant to the question of whether the payment is a gift. *See supra* p. 1219. But we agree with the Tax Court that Hernandez has failed to demonstrate that the distinction drawn by the IRS was pretextual rather than sincere and that the real basis for disallowing the deduction in this case was religious discrimination. II Stipulated Record at 181-82. Accordingly, we agree with the Tax Court's conclusion that Hernandez has failed to prove his charge of selective prosecution.

## VI. Conclusion

For the reasons stated, we find that Hernandez has failed to prove that his payments to the Church of Scientology for auditing and training services are tax deductible "charitable contributions" within the meaning of the Internal Revenue Code. 26 U.S.C. § 170(c). We further hold that section 170, both on its face and as interpreted by the Tax Court, complies with the Establishment and Free Exercise clauses of the First Amendment. Finally, we conclude that the record in this case does not support the claim that Hernandez is a victim of religious discrimination by the IRS.

The tax law as applied in this case communicates no endorsement or disapproval of any religion and creates no excessive government entanglement with religious institutions. Nor does it discourage the belief in or practice of religion. Under these circumstances, the Constitution does not permit preferential treatment of religion or allow religious organizations to interfere with the sovereign's evenhanded system of financing itself. The hard fact is that although one may not consider Caesar supreme, there are some things that must be rendered unto him.

*The judgment of the Tax Court is affirmed.*