**Ethel B. MILLER, Petitioner-Appellant,**

v.

**INTERNAL REVENUE SERVICE, Respondent-Appellee.**

**Tobias C. Tolzmann; Americans United for Separation of Church and State, Amicus Curiae.**

**No. 86–2090.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1987.

Decided Sept. 18, 1987.

Rehearing and Rehearing En Banc Denied Nov. 9, 1987.

Eric M. Lieberman (Leonard B. Boudin; Nicholas E. Poser; Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, on brief), for petitioner-appellant.

David Michael Moore, Tax Div., Dept. of Justice (Robert S. Pomerance; Michael L. Paup; Roger M. Olsen, Asst. Atty. Gen., Washington, D.C., on brief), for respondent-appellee.

(Lee Boothby; Walter E. Carson, Washington, D.C., on brief), for amicus curiae Americans United For Separation of Church and State.

(Tobias C. Tolzmann, Honolulu, Hawaii, on brief), for amicus curiae in support of petitioner-appellant.

Before PHILLIPS and WILKINSON, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Ethel B. Miller, a Virginia resident, appeals a final order of the United States Tax Court, finding a deficiency in income tax due in the amount of $256 for the taxable year 1982. Miller's deficiency followed when the Internal Revenue Service (IRS) disallowed her claimed "charitable contribution" in the amount of $3,638.18 to the Church of Scientology (Church).

This appeal is one of many. Miller, along with perhaps 1000 other taxpayers, has claimed deductions for payments to the Church for "auditing" or "pastoral counselling"—a form of one-to-one counselling or training which is the central "religious" exercise of the Church. The IRS initially challenged the deductions in Rev. Rul. 78–189, 1978–1 C.B. 68, concluding that such payments, like tuition fees paid to private or church schools, were not deductible unless the taxpayers could establish that their payments exceeded the value of benefits and privileges received in return.

Miller and others challenged the IRS position and stipulated, along with IRS, that they would be bound by "relevant findings of fact and conclusions of law" from a Tax Court test case in the Ninth Circuit. They also agreed that the stipulation would not affect the venue of any appeal and "that to the extent relevant the records in said [test case] shall be deemed part of the record ... for purposes of any ... appeal." The Tax Court decided adversely to the Ninth Circuit taxpayers in *Graham v. Commissioner,* 83 T.C. 575 (1984), a decision which incorporated the record from another case, *Church of Scientology of California v. Commissioner,* 83 T.C. 381 (1984). Once the IRS prevailed against Miller in the Tax Court on its Motion for Entry of Final Decision based on the stipulation, she appealed to this court. Other Church members have initiated identical appeals, based on the same "Stipulated Record on Appeal," in every circuit except the Federal Circuit. To date, three circuits have addressed these parallel appeals. *See Graham v. Commissioner,* 822 F.2d 844 (9th Cir. July 17, 1987); *Staples v. Commissioner,* 821 F.2d 1324 (8th Cir.1987); *Hernandez v. Commissioner,* 819 F.2d 1212 (1st Cir.1987). With this opinion, we join the Ninth and First Circuits in rejecting the contention that payments for auditing constitute "charitable contributions" and that any contrary interpretation violates the first amendment.

## I

In *Graham,* the taxpayers and the IRS agreed to a series of stipulations (limited to this litigation) which narrowly focussed the legal issue presented to the Tax Court. Most pertinently, the parties agreed that Scientology is a "religion" and that the Scientology organizations to which the taxpayers made their contested payments were "churches" within the meaning of 26 U.S.C. § 170(b)(1)(A)(i), "corporations" described in 26 U.S.C. § 170(c)(2), and exempt from general taxation as institutions "organized and operated exclusively for religious ... purposes." 26 U.S.C. § 501(c)(3). The IRS also conceded that "auditing," for which the taxpayers made the challenged payments, is not "instructional or educational" but a form of religious observance in which "no subject matter is taught, studied or learned," and that the Church does not actively solicit contributions from its members or the public but supports its operations principally through "fixed donations" paid by its members for auditing sessions. These stipulations required the Tax Court to focus initially on a single legal question: were the taxpayers' payments contributions or gifts as described in 26 U.S.C. § 170? If they were, then the taxpayers were entitled to their deductions.[1]

The Tax Court, however, decided that the *structure* of an auditing payment forecloses its characterization as a "contribution or gift." Auditing offers Church members one-to-one sessions in which members participate in the central religious observance of Scientology. Auditing is only available to members who first pay a "fixed donation" according to a published

---

1. In *Church of Scientology v. Commissioner,* 83 TC 381 (1984), the government argued successfully that the Church of Scientology of California was not operated exclusively for religious purposes under § 501(c)(3). This ruling could have provided an independent basis for denying the taxpayers' deductions in *Graham. See* § 170(c)(2)(B). The government, however, elected to challenge the deductions solely on the ground that they did not constitute a "contribution or gift," and we of course accept the consequences of the government's stipulations. The Ninth Circuit has recently affirmed the tax court's decision denying the Church's tax-exempt status in *Church of Scientology v. Commissioner,* 823 F.2d 1310 (9th Cir.1987).

schedule of charges. This "fixed donation" is never waived. The Tax Court concluded that since the Church member must pay the fixed donation in order to receive auditing services, the member's payment is not a "contribution or gift" but rather a payment made with the expectation of a substantial return benefit.

The Tax Court's analysis touches on a particularly confused issue of federal taxation. While Congress has permitted taxpayers to deduct contributions to designated non-profit organizations since 1917, successive amendments to the Internal Revenue Code (Code) have never defined the term "contribution or gift." In its present form, the Code establishes the deductibility of "any charitable contribution" in § 170(a)(1), then cryptically explains in § 170(c) that "the term 'charitable contribution' means a contribution or gift to or for the use of [designated non-profit organizations]."

Despite the importance to the Code of the abstract phrase "contribution or gift," neither Congress nor the courts have offered any very satisfactory definition.[2] The limited discussion of the phrase in legal literature has focussed on the question whether, for purposes of § 170, the phrase invites an investigation into the subjective intent or motive of the transferor, an objective assessment of the difference in value of the transferred property and any return benefits to the transferor, or some combination of the two. See Hobbet, *Charitable Contributions—How Charitable Must They Be?*, 11 Seton Hall L.Rev. 1 (1980). This doctrinal dispute traces its roots to the Supreme Court's definition of "gift" for purposes of § 102 of the Code in terms of "detached and disinterested generosity." *Commissioner v. Duberstein*, 363 U.S. 278, 286, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218 (1960). Courts have since struggled to decide whether this definition solely in terms of donative intent should also apply to § 170, and, if not, whether and how the courts should respect the common law requirement that an *inter vivos* "gift" also

be made without consideration in return for the "gift." See Colliton, *The Meaning of "Contribution or Gift" for Charitable Contribution Deduction Purposes*, 41 Ohio St.L.J. 973, 974–79. Many courts, then, have simply transposed the *Duberstein* test into the § 170 setting. See, e.g. example, *DeJong v. Commissioner*, 309 F.2d 373 (9th Cir.1962). Others have rejected the "detached and disinterested generosity" test in favor of a more objective test focussing on any return benefit to the transferor. See, e.g., *Oppewal v. United States*, 468 F.2d 1000, 1002 (1st Cir.1972) ("The more fundamental objective test is—however the payment was designated, and whatever motives the taxpayer had in making it, was it, to any substantial extent, offset by the cost of services rendered to taxpayers in the nature of tuition?"); *Singer Co. v. United States*, 449 F.2d 413, 423 (Ct.Cl.1971) ("It is our opinion that if the benefits received, or expected to be received, are substantial, and meaning by that, benefits greater than those that inure to the general public from transfers for charitable purposes (which benefits are merely *incidental* to the transfer), then in such case we feel the transferor has received, or expects to receive, a *quid pro quo* sufficient to remove the transfer from the realm of deductibility under section 170.") (emphasis in original).

This dispute over how best to determine whether a payment is a "contribution or gift" for purposes of § 170 illustrates the difficulty of defining this key abstract concept in the Code. We do not believe, however, that this appeal requires us to choose among the alternative approaches since Miller's payment does not qualify under any of the available tests: her payment was not made with "detached and disinterested generosity," but rather in the expectation that she would receive a valuable service from the Church in return for her payment.

Our conclusion is reinforced by the Ninth Circuit's analysis of the direct appeal from

---

**2.** The courts have long accepted the notion that "gift" and "contribution" are synonomous. *See DeJong v. Commissioner*, 309 F.2d 373 (9th Cir.

1962); *Channing v. United States,* 4 F.Supp. 33 (D.Mass.1934).

*Graham.* The Ninth Circuit since *DeJong* has endorsed the *Duberstein* test for § 170. As the Ninth Circuit noted, however:

The test of detached and disinterested motive is designed to determine that no measurable, specific return comes to the payor as a quid pro quo for the donation. This focus on the external features of the transaction serves as an expedient for any more intrusive inquiry into the motives of the payor.

At 848. In other words, the subjective and objective tests for a charitable "gift," both derived indirectly from the common law, coalesce; the structure of the transaction evidences the motives of the transferor. Even if the ultimate question is one of donative intent, "[i]f a transaction is structured in the form of a quid pro quo, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170." *Id.* at 849. *See also Hernandez,* 819 F.2d at 1216 (disallowing deductions to the Church where the payments were "made with the expectation of receiving a commensurate return benefit"); *United States v. American Bar Endowment,* 477 U.S. 105, 106 S.Ct. 2426, 2434, 91 L.Ed.2d 89 (1986) ("The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration.").

The transactions at issue in this appeal were unequivocally structured as payments made with the expectation of a commensurate return benefit. The Church advertised its auditing sessions, published price lists, and refused to provide the sessions without payment. The Church recognized the member's contractual right to receive the service and refunded payments if the sessions were not performed. These and other "commercial" aspects to the marketing of auditing sessions which were noted by the Tax Court in *Graham* do not, as Miller argues, necessarily clash with the government's stipulation that Scientology is a "religion." They do, however, reveal that auditing is a service whose value to the recipient is fixed in a definite schedule of prices. Since the Church member does not receive the service unless she pays the scheduled fee, the service, however labelled or analogized, is a quid pro quo for the payment and the payment is not "charitable."

On appeal, Miller does not argue that her motives varied from those of the taxpayers in *Graham,* and she does not challenge the use of a "structural" test to define "contribution or gift." Instead, she argues that the Tax Court in *Graham* erred as a matter of law in assuming that there can be a recognizable return benefit or quid pro quo when the taxpayer makes payments in return for purely "religious" as opposed to "economic" benefits. According to Miller, *any* payment to a church for "religious" services must qualify as a charitable deduction regardless of the structure of the transaction, and, apparently, without any inquiry into the taxpayer's motivations for making the payment.

The Eighth Circuit accepted this argument in *Staples,* concluding that "participation in strictly religious practices is not a recognizable return benefit under section 170." 821 F.2d at 1328. The court noted the government's stipulation that auditing is a "religious" practice. The court then agreed with the taxpayers that religious services are "not commodities that are purchased in commercial transactions," *id.* at 1327, and that the purposes of the charitable deduction are best served by automatically allowing a deduction for such religious services, *id.* at 1326–27. The court concluded that only a demonstration by the government of an "economic," as opposed to "religious," quid pro quo should lead to denial of a claimed charitable deduction. *Id.* at 1327.

There is undoubtedly an appealing quality to the Eighth Circuit's *Staples* analysis. Its near bright-line test seemingly avoids many of the conceptual problems forced by tests that require more detailed inquiries into motivation, structure, and the relationship between the *quid* and *quo* of particular transactions. It faces up honestly to

the interpretive problems that abound in this murky realm of tax law jurisprudence. In the end, it concludes that the inquiry is essentially over once the "religious" nature of services for which payment is made are either proven or conceded. Nevertheless, we respectfully disagree with some of its critical points and with its end result.

Initially, we think that the importance of the government's stipulations should not be exaggerated and may have been in *Staples*. The government stipulated that auditing was not "educational" and thereby lost its opportunity to argue that the case was controlled by past court decisions denying deductions for tuition payments to church schools. This does not, however, foreclose the courts from considering analogies to other services which provide intangible benefits to taxpayers. As *Staples* itself concedes, the IRS and the courts have recognized that "economic" value can be assigned to intangible return benefits that are difficult to translate into monetary value, and that such intangible benefits can represent a quid pro quo that precludes characterization of the payments necessary to secure such benefits as "charitable." *Id.* at 1327. *See Hernandez*, 819 F.2d at 1217. We must assume along with the Tax Court that auditing is "religious," and not "educational," and we can be sure that it is not a "commodity" as that term is ordinarily used. It is, however, a service which, *like* education or psychological counselling or the like, is sold to a recipient who ostensibly benefits from it and measures its value by the size of her payment.

We also see no justification in either the language of § 170 or the case law explicating it for drawing a distinction between "religious" and other services that produce intangible benefits. It is true that much of the case law, including *American Bar Endowment*, has concerned charitable deductions claimed for goods or services which are priced in a competitive market. In such a market, the "economic" benefit can be measured by the competitive price. *Staples* accepted the taxpayer's assertion that auditing, because it is, by stipulation, "religious" and not offered in a "competitive market," produces only a "religious" and

not an "economic" benefit. This argument is plausible on the surface, but we believe it is flawed in two fundamental ways. First, neither statute nor case law embody any fundamental distinction between "religious" and "economic" benefits, *Hernandez*, 819 F.2d at 1217–18, or between the tax treatment available to contributors to churches and contributors to other nonprofit organizations, *id.* at 1220. *See also Graham*, at 849–50. Second, the taxpayer cannot plausibly argue that there is no "economic" benefit—i.e., no intangible benefit from the service which can be assigned a dollar value—when the Church itself assigns such value in its schedule of fees. Moreover, the taxpayer does not claim that the fee exceeds the cost of providing the service. It may be true that "[s]piritual gain to an individual church member cannot be valued by any measure known in the secular realm," *Staples*, 821 F.2d at 1327, but the value which the taxpayer *expects* to receive, whether religious or secular, can be measured when she must pay a fixed fee in order to receive it. In other words, we believe that in the peculiar circumstances before us it is the *structure* of the Church's fixed donation plan, and not any post hoc characterization of the service rendered, that should determine whether the taxpayer is paying for a service of value to her or making a "charitable contribution."

Finally, we think that the structure of the fixed donation plan undermines *Staples*'s conclusion that the general purposes of § 170 are best served by categorically refusing to recognize return benefits flowing from any services established as "religious." According to *Staples*, this distinction between "religious" and other benefits is premised on the notion that "[r]eligious observances of any faith are considered under the law of charity to be of spiritual benefit to the general public as well as to members of the faith, with the private benefit to individual participants being merely incidental to the broader good that is served." *Id.* at 1326. The distinction between "incidental" and "direct" benefits to the taxpayer may be important in testing the "charitable character" of a payment.

As a general proposition, an otherwise qualifying charitable deduction will be denied only when the return benefit the taxpayer receives is *commensurate* with the value he transfers. *See, e.g., Sedam v. United States*, 518 F.2d 242, 245 (7th Cir. 1975). A church member's payments to her church, or a taxpayer's payments to other non-profit organizations, may be ordinarily deductible under such a regime because the benefits she receives are "incidental" to the benefits which flow to other members of her church or to the general public. The structure of the auditing sessions here in issue, however, insures that their benefit inures primarily to members who pay the fixed fee; the Church's literature emphasizes that the benefits of auditing are "personal," and the fixed donation plan and the Church's refusal to waive the fee insure that such benefits reach only those who pay for them. The policy arguments urged in *Staples*, then, fail to recognize that even payments to a church for "religious services" can be structured as here so that their benefit is a quid pro quo—a direct and commensurate benefit— which the member is purchasing. Such payments simply are not "gifts," either in legal or practical contemplation, and we so hold in agreement with the Tax Court.

## II

■ In addition to attacking the Tax Court's interpretation of the phrase "contribution or gift" in § 170, Miller argues that such an interpretation, even if countenanced by the Code, offends the first amendment. Not surprisingly, she can construct a colorable, if convoluted, argument that the disallowance of a charitable deduction for payments by a church member to her Church, based ultimately on the structure the Church has created for such payments, at least implicates free exercise and establishment clause concerns and suggests discriminatory enforcement of the principles of § 170 by the IRS. While these arguments, because of their complexity, deserve thoughtful consideration, we agree with the First and Ninth Circuits that they are ultimately unavailing.

We turn first to Miller's claim that the government has selectively enforced the principles of § 170 against the Church. This argument is part and parcel of Miller's general first amendment claim that § 170, as we have described its principles, "discriminates" against the Church and its adherents because they are less advantaged than they would be under a rule of their own choosing. While Miller and her Church might benefit from a different rule, however, we see no reason to depart from the Tax Court's finding of fact that the IRS did not selectively enforce § 170 against them. We need hardly add that Congress, not the IRS, created § 170, and we have no reason to believe that the IRS will fail to apply the principles that emerge from this litigation in its treatment of other religious groups.

The neutral principles underlying our definition of "charitable contribution" in § 170 also undermine Miller's Establishment Clause claims. This is not a statute which on its face makes "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 247 n. 23, 102 S.Ct. 1673, 1684 n. 23, 72 L.Ed.2d 33 (1982). Moreover, even if the statute exerts a disparate impact on the Church, "such an impact would not invalidate a neutral interpretation of a law whose purpose or primary effect is neither approval nor disapproval of any religious denomination." *Hernandez*, 819 F.2d at 1219. As the First Circuit aptly noted, the taxpayers' proposed interpretation of § 170, which would treat their payments for religious services preferentially, would offend the Establishment Clause in a much more obvious fashion than would the interpretation we endorse. *Id.* at 1220–21.

Miller's free exercise claim is the most complicated of her constitutional arguments, in large part because the alleged inhibition of her free exercise of Scientology occurs indirectly and ambiguously. Miller's free exercise argument has two principle components. First, she argues that to deny her and other Church members a deduction for their "fixed donations" would be to restrict the activities of the Church and pressure it to abandon a payment sys-

tem that is doctrinally required. Second, she argues that to deny her deduction would be to condition her receipt of a government benefit on surrender of a belief at the center of her faith. Both of these arguments are premised on the Church's "Doctrine of Exchange," which she argues *requires* her to pay for any valuable service, such as auditing, which she receives.

As the First and Ninth Circuits have observed, this argument is rife with difficulties. Her arguments premised on the likely effect on the Church of disallowing the claimed deduction ignore her lack of standing to assert such a hypothetical injury to a third party, *Hernandez*, 819 F.2d at 1224, as well as the general principle that a statute is not invalid merely because it affects the operations of a religious organization, *Graham*, at 851. Her arguments premised on the supposed impact of disallowing the deduction on her exercise of the Doctrine of Exchange are doubtful on both factual and logical grounds. The record does not convince us that the Church's fixed donation plan is mandated by the "Doctrine of Exchange," or that the Church would refuse, or forbid its members from offering, a true "gift." Even if the record supported such propositions, we do not understand how a religious belief that all benefits must be paid for by the recipient can be used to attack Congress's refusal to "give" a tax benefit to the believer. *See Hernandez*, 819 F.2d at 1222. We are simply not convinced as a factual matter that any supposed burden on Miller *or* the Church is "substantial," or that the alleged burden on Miller from any restriction of the § 170 deduction to a "contribution or gift" as we have explained that phrase interferes with her exercise of a tenet or belief central to the religious doctrine of the Church. *See Thomas v. Review Board*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981).

As both the First and Ninth Circuits have observed, even if church members could demonstrate a recognizable burden on the free exercise of their religious beliefs, such a burden would be justified in this setting by the government's compel-

ling need to preserve the integrity of the taxation system. *Hernandez*, 819 F.2d at 1225; *Graham*, at 852–53. Section 170 embodies a neutral principle which distinguishes between the consequences of payments to non-profit organizations which are "charitable" and those which are made in expectation of a quid pro quo. Any special treatment for Miller, whether through a special exemption or a strained judicial interpretation of "contribution or gift," would threaten Establishment Clause values and invite demands from other religious groups to receive similar special treatment. It would also thrust the IRS and the courts into the constitutionally sensitive business of distinguishing between "religious" and "non-religious" services. We agree with the Ninth Circuit that "the soundness of the tax system depends on government's ability to apply the tax law in a uniform and even-handed fashion, and the exemption of one presages the exemption of a great many others. The administrative difficulties in enforcing such a scheme, and the danger of manipulation, are manifest." *Graham*, At 853.

The decision of the Tax Court is affirmed.

AFFIRMED.