**Jeffrey Harold NEHER,
Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.**

No. 86–1275.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 18, 1987.

Decided July 19, 1988.

Eric M. Lieberman, Leonard B. Boudin, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, Michael J. Graetz, argued, New Haven, Conn., for petitioner-appellant.

Fred T. Goldberg, Chief Counsel, Jean Owens, I.R.S., Michael L. Paup (Lead Counsel), Roger M. Olsen, Tax Div., Dept. of Justice, Washington, D.C., Robert S. Pomerance, David M. Moore, argued, Gary R. Allen, William S. Rose, Jr., for respondent-appellee.

Lee Boothby, Berrien Springs, Mich., for Americans United Separation Church, amicus curiae.

Before JONES, WELLFORD and BOGGS, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Jeffrey Harold Neher, the appellant, appeals the denial of a federal tax deduction sought for payments made to the Church of Scientology ("the Church"). Neher, in 1978 and 1979 respectively, made payments of $3,084 and $6,019 to the Church and deducted those amounts as "charitable contributions" on his income tax returns for

those years. The Commissioner disallowed the deductions and asserted tax deficiencies of $450 for 1978 and $1,029 for 1979. Neher challenged the Commissioner's ruling in Tax Court. On March 6, 1986, the court entered its decision upholding the Commissioner's ruling. On March 17, 1986, Neher timely filed this appeal. For the following reasons, we find the Tax Court's decision to be erroneous. Accordingly, we reverse.

## I.

### A. Procedural History

The proceedings from which this appeal arises are not the type found in a typical case. Rather, this appellant was one of over 1000 similarly situated Tax Court petitioners who "contributed" money to the Church of Scientology. These taxpayers and the Commissioner agreed to be bound, subject to their right of appeal, by the Tax Court's decision in a "test" case involving only three petitioners from the Ninth Circuit. This binding decision was rendered by the Tax Court in *Graham v. Commissioner*, 83 T.C. 575 (1984). The relevant parties also agreed that the record in *Graham* would be treated as part of the record in every petitioner's case for the purposes of appeal.

After the Tax Court decided *Graham* in favor of the Commissioner, it entered judgments against the remaining petitioners. This appeal ensued as did others in every circuit court except the Federal Circuit. Indeed, as of this writing, six circuit courts have issued decisions in cases arising from these appeals. Those decisions are as follows: *Foley v. Commissioner*, 844 F.2d 94 (2d Cir.1988) (reversing the Tax Court's denial of the deductions); *Christiansen v. Commissioner*, 843 F.2d 418 (10th Cir. 1988) (affirming the Tax Court's denial of the deductions); *Miller v. Commissioner*, 829 F.2d 500 (4th Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3627 (U.S. Mar. 15, 1988) (No. 87–1449) (affirming the Tax Court's denial of the deductions); *Graham v. Commissioner*, 822 F.2d 844 (9th Cir. 1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988) (consol-idated with *Hernandez v. Commissioner*), (affirming the Tax Court's denial of the deductions); *Staples v. Commissioner*, 821 F.2d 1324 (8th Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3592 (U.S. Mar. 1, 1988) (No. 87–1382) (reversing the Tax Court's denial of the deductions); *Hernandez v. Commissioner*, 819 F.2d 1212 (1st Cir. 1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988) (affirming the Tax Court's denial of the deductions).

Today we join the Eighth and Second Circuit Courts of Appeals in holding that, under the circumstances of this case and by reason of the government's concession hereinafter discussed, the appellant's payments to the Church were "contributions" under the Internal Revenue Code ("IRS" or "the Code"), 26 U.S.C. § 170(c)(2)(B) (1982), and therefore, his deductions were wrongfully denied.

### B. The Practice of Scientology

The appellant, Jeffrey Neher, is a Scientologist and was so during the tax years in question. The Tax Court made several factual findings as to the religious practices of Scientology. Those findings, which we adopt, can be found in the Tax Court's decision in *Graham, see* 83 T.C. at 577–79, and in the subsequent opinion of the Ninth Circuit Court of Appeals affirming the Tax Court's decision. *See Graham*, 822 F.2d at 846–47. The relevant findings are as follows.

Scientology teaches that the individual is a spiritual being having a mind and a body. Part of the mind, called the reactive mind, is unconscious. It is filled with mental images that are frequently the source of irrational behavior. Through the administration of a process known as *auditing*, one of Scientology's two central religious practices, an individual, called a *preclear*, is helped to erase his reactive mind and gain spiritual competence. Auditing is also known as processing, counseling, and pastoral counseling. *Training*, Scientologists' second central religious practice, is a discipline distinct from auditing. It involves courses of instruction in the tenets of Scientology.

Scientologists believe that they can attain benefits from both auditing and training, but only in degrees or steps. These include levels called "Grades" and higher levels called "OT sections." The various steps or degrees of accomplishment are set forth in a chart entitled "Classification Gradation and Awareness Chart of Levels and Certificates."

A trained Scientologist, known as an auditor, administers the auditing. He is aided by an "E-meter." This device helps the auditor identify the preclear's areas of spiritual difficulty by measuring skin responses during a question and answer session. These auditing sessions are offered in fixed blocks of time called "intensives." Although auditing sessions are done in one-on-one situations, such sessions are ritualized, not individualized. That is, auditing sessions are strictly conducted pursuant to direction found in the Scientology scriptures.

Training is also delivered by a trained Scientologist. Course offerings range from basic courses which introduce the doctrines and texts of Scientology through advanced courses which train and qualify auditors to deliver auditing at the highest level.

One of the tenets of Scientology is that any time a person receives something, he must pay something back. This is called the *doctrine of exchange.* The Church of Scientology applies this doctrine by charging a fixed donation for training and auditing. With few exceptions, these services are *never* given for free. *Thus, fixed donations are generally a prerequisite to a person receiving auditing and training.* These fixed donation payments clearly constitute the majority of the Church's funds and are used to pay the costs of Church operations and activities.

Over the period at issue, the general rates for the fixed donations for auditing varied with the amount of auditing time involved. The Church's "price lists" disclose that fees for auditing services ranged

from $625 for a 12½ hour "intensive," or session, to $4,250 for a 100 hour intensive. Additional fees were required for specialized types of auditing.

Members of the Church are encouraged to make advance payments for Scientology courses. If the payment is made well in advance of the services, a discount of five percent can be obtained. When a Scientologist makes an advance payment, the Church credits his account. Once the member begins receiving a service, his account is debited. It is also the Church's policy to refund advance payments upon request at any time before services are received.

The Church promotes its services through free lectures, congresses, free personality tests and handouts. Advertisements are placed in newspapers, magazines and on the radio. These promotional activities are geared to be responsive to community concerns, which are determined from surveys.

The Tax Court in *Graham* specifically found that the Church operates in a commercial manner in providing these religious services. *See* 83 T.C. at 578. The court found that by internal policy memoranda, the Church sets its goal as the making of money and that that goal permeates virtually all of the Church's activities, services, pricing policies, dissemination practices and management decisions.

We find that factual determination to be irrelevant and not controlling in this circumstance.

Rather, the government, for the purposes of the eleven appeals arising from the Tax Court's *Graham* litigation, has *conceded* that the Church of Scientology *is* a "religion" and a "church" within the meaning of section 170 of the Internal Revenue Code of 1954 ("Code"),[1] 26 U.S.C. § 170(b)(1)(A)(i) (1982), and a qualified corporation under section 170(c)(2), thus entitled to receive deductible charitable contributions. *See Graham,* 83 T.C. at 576.

---

**1.** All references to the Code are to the Internal Revenue Code of 1954 as amended and in effect during the tax years in question.

The Commissioner made these concessions even though the record indicates that his original reason for disallowing the deductions was because the organization itself, *i.e.*, the Church of Scientology, was not a qualified entity. This reasoning was based upon the Commissioner's revocation of the Church's tax-exempt status. This revocation was upheld by the Tax Court in *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984), *aff'd*, 823 F.2d 1310 (9th Cir.1987), *cert. denied*, ── U.S. ──, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988). The Ninth Circuit Court of Appeals, however, affirmed that decision only recently, July 28, 1987, and the government apparently decided to expedite the proceedings at issue and thus chose not to wait for the above case's final outcome. However, in deciding this case, we, as a matter of course, must accept the stipulations from the respective parties and the Tax Court's findings that the Church of Scientology is indeed a "church" and that auditing and training are indeed "religious practices," thereby ignoring any findings or statements to the contrary.[2]

Because of these concessions, our function in this case is limited. That is, we need determine only whether the payments made by the appellant to the Church were "gifts" or "contributions" within the meaning of the relevant statute and thus deserving of a federal income tax deduction.

In making this decision, we look to Internal Revenue Code section 7482(a) for guidance. This section not only provides our jurisdiction to hear this case, but also sets forth our appropriate standard of review. Indeed, section 7482(a) provides, in pertinent part, that:

> [t]he United States Court of Appeals ... shall have exclusive jurisdiction to review the decisions of the Tax Court ... in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury....

26 U.S.C. § 7482(a) (1982). Therefore, in this circuit, findings of fact by the Tax

Court are subject to the "clearly erroneous" standard of review, while questions of law are reviewed *de novo*. *Metallics Recycling Co. v. Commissioner*, 732 F.2d 523, 526 (6th Cir.1984). And, the clearly erroneous standard is met when " 'although there is evidence to support [the findings],' this Court 'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Adler v. Commissioner*, 422 F.2d 63, 64 (6th Cir. 1970) (quoting *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960)). This standard is also applicable to any factual inferences drawn by the Tax Court from undisputed basic facts. *Ohio Teamsters Educ. & Safety Training Trust Fund v. Commissioner*, 692 F.2d 432, 435 (6th Cir.1982). *See also Commissioner v. Duberstein* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960).

## II.

▮ A taxpayer may take a deduction under section 170 of the Code, 26 U.S.C. § 170 (1982), for a gift or contribution made to a qualified religious organization. *See* 26 U.S.C. § 170(c)(2)(B) (A "charitable contribution" is "a contribution or gift to or for the use of" a domestic entity "organized and operated exclusively" for religious or charitable purposes.). This does not mean, however, that *any* payment to such an organization is deductible; rather, the burden is on the taxpayer to prove that such a payment was a "gift" or "contribution" within the meaning of the statute. *See Staples v. Commissioner*, 821 F.2d 1324, 1326 (8th Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3592 (U.S. Mar. 1, 1988) (No. 87–1382) (citing *Estate of Wood v. Commissioner*, 39 T.C. 1, 6 (1962)). *See also New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934) ("[A] taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms.").

---

**2.** Both parties to this appeal made numerous other stipulations which are not set out within   this opinion.

■ In determining whether a payment to a qualified organization is a charitable contribution or gift, a number of courts now look to see whether the payment was a voluntary transfer made without consideration, or a payment made with the expectation of receiving a commensurate benefit in return. *See, e.g., Oppewal v. Commissioner,* 468 F.2d 1000, 1002 (1st Cir.1972). This standard, an objective one, focuses on the return received or expected by the taxpayer as opposed to the subjective "detached and disinterested generosity" test set forth by the Court in *Commissioner v. Duberstein,* 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), which focuses on the intent or motive of the payor. (*Duberstein* was not a section 170 case, but rather involved section 102(a) and the determination of whether a transfer was a payment or a gift for the purposes of including it as income to the transferee.) While the Ninth and Tenth Circuits, *see, e.g., Christiansen v. Commissioner,* 843 F.2d 418 (10th Cir. 1988) and *Graham v. Commissioner,* 822 F.2d 844, 848 (9th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (consolidated with *Hernandez v. Commissioner),* still use the *Duberstein* subjective analysis, a number of circuits have apparently switched to an objective analysis, although this court has not expressly adopted such a standard. A district court within this circuit, however, has clearly and succinctly spelled out the differences in the two standards, analyzed the appropriate legislative history, and expressly adopted the objective standard. *See Haak v. United States,* 451 F.Supp. 1087 (W.D.Mich. 1978). In so doing, the *Haak* court stated:

Courts have split on the appropriate test to be used in determining whether a particular transaction was a "contribution or gift." Initially, courts applied the definition of "gift" propounded by the Supreme Court in *Commissioner v. Duberstein....*

More recently, however, courts have tended to reject the "pure" *Duberstein* test focusing on motive alone in favor of a "fundamental objective" or "quid pro quo" test. Under this test the issue is whether the transfer was "to any substantial extent, offset by the cost of services rendered to [the] taxpayers."

[This] Court concludes that [the] latter test is more appropriately applied in section 170 cases. [Indeed,] [t]he legislative history of the Internal Revenue Code of 1954 indicates that a primary factor to be considered in determining whether [a] transaction is a charitable contribution is whether the "contribution ... [is] made with no expectation of a financial return commensurate with the amount of the gift."

*Haak,* 451 F.Supp. at 1089–90 (citations omitted).

We adopt the reasoning of the *Haak* court and thereby employ the objective standard to determine the merits of this case. In so doing, we note that the Tax Court cited *Haak* in its *Graham* decision. Indeed, in holding that Neher's payments were not deductible contributions, the Tax Court stated:

The record demonstrates clearly that these payments were not voluntary transfers without consideration, but were made with the expectation of receiving a commensurate benefit in return. In addition, where contributions are made with the expectation of receiving a benefit, and such benefit is received, the transfer is not a charitable contribution, but rather a quid pro quo.

*Graham,* 83 T.C. at 581 (citing *Haak,* 451 F.Supp. at 1090–91).

Furthermore, we point out that our adoption of an objective standard is consistent with a recent Supreme Court decision in this area. *See United States v. American Bar Endowment,* 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986). *American Bar* sets forth a standard which has been relied upon by the four circuit courts which have decided this issue in favor of the Commissioner. That standard provides as follows:

A payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return.

. . . .

The *sine qua non* of a charitable contribution is a transfer of money or property

without adequate consideration. The taxpayer, therefore, must at a minimum demonstrate that he purposely contributed money or property in excess of any benefit he received in return.

*American Bar,* 477 U.S. at 116–18, 106 S.Ct. at 2434.

■■■■ When this objective standard is applied to the facts at hand, we find that the Tax Court erred in its decision denying the appellant a "charitable contribution" deduction for his payments to the Church. In reaching our decision, we take notice of the congressional intent behind section 170. In structuring the charitable contribution deduction, Congress was attempting to facilitate the performance of the enumerated charitable purposes and objectives. Therefore, courts must distinguish

> those transactions which are in reality an exchange of cash for specific services from those transactions which are transfers for facilitation of the general charitable purpose of the organization. Thus where a transfer is made to a charitable organization with the expectation of receiving a specific tangible benefit in return, there should be no deduction under section 170.

*Haak,* 451 F.Supp. at 1091.

Each citation above pairs the "benefit" or "consideration" whose return will result in disallowance of the contribution by a qualifying adjective: "commensurate," "adequate," or "tangible." This simply recognizes the obvious fact that, in some sense, no one acts unless action is preferable to inaction, in some dimension. The whole concept "psychic income" has been developed to account for people doing things which appear irrational in strictly monetary terms. Thus, every gift presumably provides the giver with some return, whether in the form of public acclaim, reputation for uprightness, or simply internal satisfaction. We must look elsewhere for the distinction of those types of returns that would prevent the deduction for charitable contributions.

In so doing, however, courts must heed a second congressional concern underlying section 170. That is, Congress feared that the tax advantages which accrued to charitable organizations would give them an unfair advantage over noncharitable entities. Thus,

> [a] primary motivation of the Revenue Act of 1950 was to eliminate the dangers of this unfair competition by treating those charitable organizations engaging in business activities unrelated to their charitable purpose the same as their noncharitable competitors. Reading the Revenue Act of 1950 in conjunction with section 170, *when a charitable organization is engaged in one of the charitable activities enumerated by Congress, contributions in furtherance of those activities are be encouraged, and are therefore properly exempt from taxation. Where contributions are merely payments for services rendered, however, they are only a quid pro quo and cannot therefore further the charitable purposes of the organization to the same extent an outright gift would. In addition, such contributions raise the danger of competition with private business providing similar services, and to render such payments tax exempt would provide that unfair advantage feared by Congress.*

*Haak,* 451 F.Supp. at 1090–91 (emphasis added).

Our decision granting the appellant a deduction for his payments to the Church is true to the above congressional concerns. In fact, our decision is the only conclusion we could reach and remain consistent with such concerns. This is because the Church of Scientology, pursuant to the stipulations and concessions in this case, is a charitable organization engaged in one of the charitable activities enumerated by Congress in section 170 when it provides auditing and training to its members. Furthermore, the payments made by the appellant to the Church furthered the charitable purposes of the Church since payments for auditing and training are the Church's predominant means of raising money to support its activities. Thus, this type of payment, in keeping with the Scientologist practice of the doctrine of exchange, is as much a

furtherance of the Church's charitable purposes as an outright gift. Finally, because similar services are not provided by a private business entity, the fairness and equality concerns expressed above are not applicable.

Although some might observe that the Scientologist practices here, (just as those of more conventional religions), could provide some psychological benefit akin to that of commercial psychiatric therapy, there is no contention that there is any general commercial market for these services, or that Scientology provides unfair competition for psychiatrists.

Thus, our conclusion in no way violates the applicable congressional concerns and intent behind section 170, but instead adheres to and strengthens them.

### III.

In holding that the appellant was not entitled to a deduction for his payments to the Church, the Tax Court found that Neher had received a return, equivalent to his payment, in the form of a religious or spiritual benefit.

An appropriate test of marketable financial value might be what would be paid for such services by persons not of the relevant faith. Thus, while it might be possible that a music-lover would pay concert prices to attend a High Holy Days service where a famous singer was serving as Cantor, in the vast majority of cases there is no market for religious services outside the relevant religious community. There is certainly no evidence that there is any general market for Scientologist religious services.

The Tax Court, and the subsequent circuit courts who have rendered decisions upholding the Tax Court, relied upon the language from *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986), quoted in Part II of this opinion, to hold that the benefit one receives in return for a contribution or payment of money need *not* be financial or economic, but can be of a spiritual or religious nature. The appellant, however, cites to several cases, including a district court decision from this circuit, *i.e., Haak v. United States*, 451 F.Supp. 1087 (W.D. Mich.1978), which suggest a requirement to the contrary. He also argues that because he only profited religiously or spiritually, no economic or monetary value can be placed upon his return. Indeed, Neher claims that *any* payment made for a religious or spiritual return or benefit should, as a matter of law, be considered a charitable contribution.

Furthermore, Neher points out that *fixed* donations of money to other churches and religions by persons seeking a spiritual gain have consistently been held to be within the meaning of the statutory definition of "charitable contribution." Neher points to payments for pew rents, periodic church dues, building fund assessments and basket collections. *See* Rev.Rul. 70–47, 1970–1 C.B. 49. The circuit courts upholding the decision of the Tax Court, however, have addressed this question and distinguished those donations from the present situation. Those courts have concluded that those situations involve only incidental or nominal benefits to the donor as opposed to the direct one-on-one counseling sessions involved here. Neher argues, however, that such a distinction is hard to accept. We now address each of these contentions.

There is quite an amount of case law which appears to support Neher's argument that the return benefit must be financial or economic in nature for the taxpayer's deduction to be denied. The cases, as well as the legislative history of section 170, identify nondeductible payments as those in which the payor received a return which was material, tangible, financial or economic. *See, e.g., Winters v. Commissioner*, 468 F.2d 778, 780 (2d Cir.1972); *DeJong v. Commissioner*, 309 F.2d 373, 379 (9th Cir.1962); *Haak*, 451 F.Supp. at 1091; *Murphy v. Commissioner*, 54 T.C. 249, 253 (1970). *See also* S.Rep. No. 1622, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Admin.News 4621, 4830–31; H.R.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Admin.News 4017, 4180. While it is true that *American Bar* seemingly does not use

such language, that case is not exactly on all fours with this appeal. In that case, it was *assumed* that the basic payments were made in exchange for the receipt of an economic benefit—*i.e.*, the payments were made in order to receive insurance policies. Indeed, in *American Bar* the "dual character" analysis was employed. That is, the taxpayers there received a deduction only for the difference between the payment made and the fair market value of the benefit—the policy—received. Thus, the *American Bar* taxpayers received an indisputable *tangible* benefit with a measurable market value for their payments to a qualified charitable organization. Accordingly, the dual character analysis was appropriately employed by the Court.

Here, in contrast, no tangible or recognizable benefit—financial or nonfinancial—was received. Instead, Neher received the right to participate in religious worship; an item without a marketable financial value which could be used to offset the amount of his contributions.

According to the language found in the majority of the cases, it would appear that a financial or economic return or benefit is required to make a contribution nondeductible; of course such language may simply reflect the courts' thoughts as to the difficulty of valuing any other type of return. However, *American Bar*, the latest decision from the Supreme Court, does not indicate that such a return need be economic, but, that case itself involved a return on which a material or financial value could be placed, *i.e.*, an insurance policy.

■ Without committing ourselves to the proposition that a payor must receive an "economic" benefit in order for his payment to be declared nondeductible, we find, on other grounds, that a strictly spiritual or religious return is simply not enough to make a contribution a "non-contribution" or a gift a "non-gift".

Instead, we believe that the problems a court would encounter in attempting to value a truly intangible return such as the one at issue are insurmountable. Although the government argues that this court need not value the services received by the appellant since the Church has already done so, such an argument is deceiving. In what other fashion can a court determine whether such a return was commensurate with the contribution? The First Circuit Court of Appeals, however, in affirming the Tax Court's decision, points out that there are ways in which courts can assign value to such an intangible benefit and, in fact, have already made such determinations in the past. *See Hernandez v. Commissioner*, 819 F.2d 1212, 1217 (1st Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988). The *Hernandez* court stated:

> [The appellant] claims that while the government may assign economic value to secular benefits, it is impossible for the government to determine the economic value of religious benefits. As a practical matter, we note that the government has recognized the economic value assigned to secular services such as adoption services, symphony performances, and museum admissions even though the benefits flowing from those services are, in theory, as difficult to monetarize as religious ones. In such cases the courts and the IRS look not to the intrinsic value of the benefits, but instead either to *(1) the price set by the service providers, (2) the prices set by providers of similar services, or (3) the costs of providing the service.*

*Hernandez*, 819 F.2d at 1217 (citations omitted and emphasis added). We find, however, that all three of the *Hernandez* court's suggestions are unworkable in the religious context.

First, as pointed out by the Eighth Circuit Court of Appeals in *Staples v. Commissioner*, 821 F.2d 1324 (8th Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3592 (U.S. Mar. 1, 1988) (No. 87–1382), the stipulations and concessions by the parties foreclose any reliance on the appellant's donations as to the value of the offered services. *Staples*, 821 F.2d at 1327–28 ("Under the stipulations the fixed donations are not market prices set to reap the profits of a commercial moneymaking venture; rather the [Church] is a bona fide church which

selected fixed donations as its mechanism for raising funds from its members."). Thus, the first suggestion by the *Hernandez* court is not useful.

Second, there are no other providers of similar services to whom the court may look so as to place a value on the offered services. Furthermore, any such approach might well create problems of constitutional magnitude.

Third, to make a determination on the basis of the cost to the Church for providing auditing and training would cause the court to become entangled in the Church's finances and bookkeeping operations. Such action is simply not permissible and is precisely what the members of this panel fear may happen. That is, a decision to the contrary today may well lead to the monitoring and auditing of church records by the government. Even the *Hernandez* court admits that this problem may arise with the approach it has taken to this most difficult question:

> We can hypothesize cases in which a literal application of the *American Bar Endowment* test could create both practical and constitutional difficulties. Imagine, for example, a case in which the government monitored church records in an attempt to place a monetary value on the benefit of all church services, group programs, and pastoral counselling [sic] generally available to contributing members. Such a case would present not only the problem of determining value but also the problem of excessive entanglement in the affairs [of] a religious institution. The present case, however, raises neither of these problems....

*Hernandez*, 819 F.2d at 1218.

Because we believe that the case at hand presents the very problems that the *Hernandez* court envisions occurring in the future, we depart from that court's reasoning that a value can be assigned to a return like that received by the appellant in this case. Instead, we believe that participation in religious worship, *i.e.*, auditing and training, is very different than a ticket to the museum or the symphony. Indeed, those events are items which have marketable commercial values and prices which have been set for the public at large. A valuation of a return in that instance is certainly not impossible. In contrast, the benefit one receives from participating in religious worship, a uniquely *personal* benefit, is hard to quantify and heretofore has not been quantified. Thus, we refuse to place ourselves in the unenviable position of having to determine the benefit to a given individual when no other individual shares the same circumstances.

Further, by this standard, the "return" from a priest who hears more confessions would be less than that of a similarly remunerated priest who hears fewer confessions. The "return" in wisdom gained from hearing the preacher of a small congregation might be held to be much greater than that from one who has attracted enough parishioners who spread the similar cost more widely. This is an obviously unworkable standard.

Neher's request that we draw a distinction between religious benefits and all other benefits received for monetary contributions to qualified entities might be interpreted as a request to draw bright lines where they simply do not exist, *i.e.*, making distinctions among the different charitable organizations (religious, educational, scientific, artistic) found in section 170. However, we believe that, in addition to the reasoning set forth above, such an argument is more than addressed by the Eighth Circuit's decision in *Staples*. *See* 821 F.2d at 1326–28. That court's conclusions emphasize the necessary differences between religious benefits and all other benefits and thus lead us to concur in that court's opinion.

Finally, we take into account Neher's argument as to the deductibility of fixed donations made to other religions and churches. Particularly notable are the Mormon tithing requirements and the admission fee to Jewish High Holy Day Services. Both of these requirements center around the admission to the temple, a place of great importance to the members of these two religions. These fixed requirements, as well as other fixed contributions

made in the form of collection plate offerings, bequests for masses, pew rents and mandatory church dues, have long been held to be deductible as charitable contributions. *See* Rev.Rul. 78–366, 1978–2 C.B. 241 (bequests for masses); Rev.Rul. 76–323, 1976–2 C.B. 18 (fixed payments based on church members' income from "required" outside employment); Rev.Rul. 70–47, 1970–1 C.B. 39 (pew rents, building fund assessments and mandatory church dues). Even the other circuit courts that have upheld the Tax Court's *Graham* decision admit that there may be some inconsistency between these rulings and their decisions. *See, e.g., Hernandez,* 819 F.2d at 1227 ("[W]e have some doubt as to the continuing validity of the presumption in Rev.Rul. 70–47, 170–1 [sic] C.B. 39, that pew rents and mandatory church dues are tax deductible gifts...."); *Graham v. Commissioner,* 822 F.2d 844, 850 (9th Cir. 1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988) (consolidated with *Hernandez v. Commissioner*) ("The Tax Court had sufficient evidence to distinguish appellants' fixed donations from deductible payments to religious organizations in which the primary motivation is presumed to be charitable, ... though we are not convinced that every one of those rulings would comport with the analysis of section 170 that we have set forth here.") (citations omitted).

The *Hernandez* court, however, attempted to distinguish its decision from the past rulings by pointing out that pew rents and periodic fixed dues, or tithes, obtain for members the right to participate in collective worship services while the appellant in this case received an opportunity to participate in an individualized service. Such a distinction is without meaning. Donations to churches related to participation in religious worship have long been held *not* to yield specific private benefits to the donor, who is considered only an incidental beneficiary, but to render primary benefit to the members of the religion and the public at large. *See* Rev.Rul. 71–580, 1971–2 C.B. 235–36. *See also Foley v. Commissioner,* 844 F.2d 94, 96 (2d Cir.1988); *Staples,* 821

F.2d at 1326 ("The public benefit from religion remains and predominates regardless of whether church doctrines provide for traditional congregational worship or individual worship as in Scientology or whether donations are voluntary or fixed.") (citations omitted). Such a holding is applicable here as the appellant made his contributions with full awareness that his payments for participation in auditing and training comprised a portion of the *principal support* of the Church. As such, the primary purpose of the payments was to benefit and further the religious objectives of the Church, thereby rendering the primary benefit to the Church's members and the public at large. *Foley,* 844 F.2d at 97.

In light of this fact, we respectfully disagree with the Tax Court and, to this date, four circuit courts that a meaningful distinction can be drawn between this contribution and the others previously held to be deductible. Therefore, we find that Neher's payments to the Church to participate in religious services were charitable contributions and thus, Neher was entitled to a federal income tax deduction for those payments. As pointed out by the dissenting judge in *Christiansen v. Commissioner,* the Tenth Circuit's decision in this multi-circuit litigation, "any other conclusion has ominous implications for all religious institutions." *See Christiansen v. Commissioner,* 843 F.2d 418, 421 (10th Cir.1988) (Seymour, J., dissenting).

IV.

Because we hold that Neher's payments to the Church for auditing and training, two distinct and separate Scientology religious practices, were "charitable contributions" within the meaning of section 170, we reach neither the constitutional claims raised by Neher nor his selective prosecution claim.

Therefore, for all of the foregoing reasons, the decision of the Tax Court is hereby REVERSED.

WELLFORD, Circuit Judge, concurring.

I concur in Judge Jones' well reasoned opinion, and write briefly only to emphasize

**858**

two factors that seem particularly important in this decision. First, the government itself, for whatever reasons, has conceded for purposes of this case (and the others similarly situated) that the Church of Scientology is a "church," a tax exempt organization. At the same time, in other proceedings noted by Judge Jones in his opinion, the government has expressly challenged the Church of Scientology's tax exempt status, and, in fact, has successfully revoked its tax exemption. (*Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984), *aff'd* 823 F.2d 1310 (9th Cir.1987)). Our decision then applies in this limited and specific situation where the government has waived or relinquished here any challenge to the tax exempt status of the Church in question and the commercial nature of its operation. It seems to me that the proper avenue of challenge by the government is to the tax exemption claimed by this organization which seems to possess more characteristics of commercial activity than of spiritual concerns usually associated with a church or a religion. (One is struck by its emphasis, for example, on "auditing" and on the doctrine of "exchange.")

I am further persuaded by the rationale of *Staples* and those other courts and judges that have followed the reasoning of the Eighth Circuit therein, and the emphasis on no "recognizable return benefit under section 170" where the government has initially conceded that the practices and "contributions" in question are "religious practices" in a bona fide church.

I would therefore concur in the reversal of the Tax Court's decision.